[No. 29577. *En Banc.* April 9, 1945.]

CHARLES RUMBOLZ *et al., Appellants,* v. PUBLIC UTILITY
DISTRICT No. 1 OF OKANOGAN COUNTY
*et al., Respondents.*[1]

[1]Reported in 157 P. (2d) 927.

*Paine, Lowe & Coffin, H. E. T. Herman, Joseph Wicks,* and *Eugene D. Clough,* for appellants.

*Houghton, Cluck & Coughlin,* and *E. K. Murray,* for respondents.

ROBINSON, J.—In December, 1939, public utility district No. 1 of Okanogan county, a county-wide district, passed the necessary resolutions to institute a condemnation of the major part of the electric power properties of The Washington Water Power Company, situated in that county. The judgment in the condemnation case was, however, not entered until February 4, 1943. On appeal, modifications were ordered by this court in a decision rendered on April 7, 1944 (20 Wn. (2d) 384, 147 P. (2d) 923), and final judgment incorporating them was entered on October 30, 1944.

On November 30, 1944, the district, as a step toward financing the transaction, purported to amend or supplement the resolutions of 1939, upon which the condemnation action was based, by providing for a bond issue of a face value of $2,702,000, a much larger amount than that contemplated by the resolutions passed in 1939. It was provided that the bonds to be issued should bear date December 1, 1944. On the same date, that is, November 30, 1944, the district, by resolution No. 49, accepted the bid of the Ballard-Hassett Company of Des Moines, Iowa, in the amount of $2,608,943.12. This agreement, as is shown

by resolution No. 50, also passed the same day, was upon the condition that a decree of appropriation should be entered in the condemnation suit.

The appellants began this action for an injunction on December 6, 1944. The commission demurred to the complaint on December 19, 1944, and on December 26th the district notified the condemnee, The Washington Water Power Company, that it would present a decree of appropriation in the condemnation suit on January 17, 1945. A day or two previously, the appellants filed an amended complaint in which they prayed for the following relief: (1) a temporary injunction enjoining the defendants from issuing, or contracting to issue, or from consummating the sale of, bonds in excess of $2,000,000, and enjoining the defendants from using any moneys realized in excess of $2,000,000 from the sale of bonds for payment in connection with the entry of a decree of appropriation; (2) for a permanent injunction to the same effect.

By stipulation and agreement between the parties, a hearing was held on the merits on January 5, 1945, before the Honorable Ralph O. Olson, judge of the superior court of Whatcom county, who had tried the condemnation action. He was asked to make a prompt decision. He notified the parties on January 10th that he would deny the injunction and suggested a dismissal. A formal judgment to that effect was entered on January 16th, from which this appeal was taken on January 17th.

On January 22nd, appellants filed a petition seeking to restrain the district from going forward with the matter until the appeal should have been heard and determined. It will be sufficient for our present purpose to say that a temporary restraining order was issued on appellants' filing a $25,000 cash bond, and another date was set for a hearing on the matter of the temporary injunction. The department which heard the matter the second time was unable to reach a decision, and the court was assembled to hear it *En Banc*. In the meantime, the parties had stipulated that the appeal might be heard on its merits on March 30th. The court, sitting *En Banc,* on February

14th replaced the restraining order by an injunction *pendente lite*. The case was heard on its merits on March 30th.

To a certain degree, the merits of the matter were argued on all four of these hearings, since it was incumbent upon appellants to show some possible merit to the appeal in order to secure the stay orders. The records of the court show that all nine of the judges have heard argument on the matter twice; three of them, four times; and six, three times. We call attention to this to indicate that the merits have been thoroughly considered, because that may not seem clearly apparent from this opinion. For, since we have concluded to affirm the judgment and order appealed from, we think it important to both parties that our decision be announced as promptly as may be; important to the district, since it will enable it to take the necessary steps at once to complete the condemnation which has now been pending for more than five years; and to the appellants, because the decision will prevent the possible accrual of further liability on their bond. Accordingly, this opinion must be somewhat hastily prepared.

The position taken by the adversary parties makes it necessary to discuss at least two questions: (1) Did the appellants have the legal capacity to bring this action? (2) Will the district, by issuing, or attempting to issue, bonds in the amount of $2,702,000, so far depart from the statute as to vitiate the whole condemnation proceedings?

As to the first question, it is our opinion that the condemnee, The Washington Water Power Company, must have the right, until the condemnation is finally concluded by a decree of appropriation, to raise a question as to the effectiveness of the condemnation, although it cannot go behind the judgment directed by this court on its appeal from the condemnation award.

The individual appellants assert rights as taxpayers and as long-time users of electric power who are so situated that they must remain so if the property passes into the hands of the district. As taxpayers, their position seems somewhat tenuous, since the bonds involved are

payable from revenues only. But, as persons dependent upon the utility, they have an interest in the matter, somewhat minor, of course, as individuals. However, in such an action as this, we think they should be regarded as representatives of all of the great number of persons similarly situated. From that point of view, we think they had the capacity to join in prosecuting this action. With this somewhat summary disposition of the first question—perhaps, too summary—we pass to the merits.

The respondent district is organized under and pursuant to chapter 1, p. 3, Laws of 1931. This act, which is codified in Remington's Revised Statutes as §§ 11605—11616 [P. C. §§ 4498-11—4498-22], inclusive, is commonly referred to as the Bone power bill. It was first proposed to the legislature by the people under the procedure provided in amendment seven to the state constitution. The legislative history of the act is concisely shown on page 30 of the Laws of 1931, as follows:

"Filed in office of secretary of state October 25, 1928.
"Submitted to the Legislature January 21, 1929.
"Rejected by the Legislature February 1, 1929.
"Passed by vote of the people at the general election November 4, 1930."

The act contains twelve sections, and is, in all, thirty pages in length. The first five sections provide for the establishment of public utility districts by popular vote. Section 6 (Rem. Rev. Stat., § 11610 [P. C. § 4498-16] (b)) confers extremely broad powers upon the commissions of such districts when organized. It is with the following language of that section, and particularly that which we italicized with which we are now concerned:

"All public utility districts organized under the provisions of this act shall have power: . . .
"(b) To . . . condemn and purchase . . . plants, plant facilities and systems for generating electric energy by water power, steam or other methods, . . . buildings, structures, poles and pole lines, and cables and conduits and any and all other facilities, and to exercise the right of eminent domain to effectuate the foregoing purposes . . . *and such right of eminent domain shall*

*be exercised and instituted pursuant to resolution of the*
*commission and conducted in the same manner and by*
*the same procedure as is or may be provided by law for the*
*exercise of the power of eminent domain by incorporated*
*cities and towns of the State of Washington in the acquisi-*
*tion of like property and property rights. . . ."*

We are also vitally concerned with a portion of § 7 of the act (Rem. Rev. Stat., § 11611 [P. C. § 4498-17]), and particularly with that language which we have italicized:

"Whenever the commission shall deem it advisable that the public utility district purchase, purchase and condemn, acquire, or construct any such public utility, or make any additions or betterments thereto, or extensions thereof, *the commission shall provide therefor by resolution, which shall specify and adopt the system or plan proposed, and declare the estimated cost thereof, as near as may be, and specify whether general or utility indebtedness is to be incurred, the amount of such indebtedness,* the amount of interest and the time in which all general bonds (if any) shall be paid, not to exceed thirty years. In the event the proposed general indebtedness to be incurred will bring the indebtedness of the public utility district to an amount exceeding one and one-half per cent (1½%) of the taxable property of the public utility district, the proposition of incurring such indebtedness and the proposed plan or system shall be submitted to the qualified electors of said public utility district for their assent at the next general election held in such public utility district.

"Whenever the commission (or a majority of the qualified voters of such public utility district, voting at said election, when it is necessary to submit the same to said voters) shall have adopted a system or plan for any such public utility, as aforesaid, and shall have authorized indebtedness therefor by a three-fifths vote of the qualified voters of such district, voting at said election, general or public utility bonds may be used as hereinafter provided. . . ."

While we have the above quotation directly before us, we desire to point out that the act—as could be even more readily demonstrated if we had space to quote the remaining two and one-half pages of § 7—sets up, mingled in one section, two different methods of procedure: one where

the funds to be used to pay for the property condemned are to be secured by issuing bonds having no other security behind them than the rosy prospects of the venture; the other, where that security is buttressed by a reserve power to tax. It is easy to see why, under the latter plan, it is required that the resolution shall state the amount of indebtedness to be incurred; otherwise, it could not be determined whether or not an election was required. It seems even easier to see that, if an election were required—and was had—then that amount could not be validly increased thereafter. This was the question presented in *Uhler v. Olympia*, 87 Wash. 1, 151 Pac. 117, on rehearing, 152 Pac. 998. The case of *Bremerton v. North Pacific Public Service Co.*, 243 Fed. 980, upon which appellants place much reliance, follows the *Uhler* case and is, in essence, a case of the same type.

It is, however, impossible to assign a plausible reason why the amount of the indebtedness to be incurred is of any special importance when that indebtedness is to be utility indebtedness. Counsel on both sides of this case appeared unable to give any such reason, and we are not able to do so. It was suggested that the provision is so worded merely because the draftsman of the statute was struggling to cover two different situations in the same paragraph in an attempt to achieve a reasonable brevity, and that we may reasonably construe the provision as mandatory when general indebtedness is to be incurred, but no more than directory when utility indebtedness only is involved. The suggestion is by no means fantastic when it is noted that the vast and sweeping powers which this statute gives to the district commissioners are supplemented by the following provision appearing near the end of the act:

"The rule of strict construction shall have no application to this act, but the same shall be liberally construed, in order to carry out the purposes and objects for which this act is intended." Laws of 1931, chapter 1, p. 29, § 11; Rem. Rev. Stat., § 11615 [P. C. § 4498-21].

However, we do not base our decisions upon that ground. The position taken by the appellants may be outlined as follows:

(1) The statute requires that the condemnation proceedings shall be initiated by a resolution which shall specify and adopt a system or plan declaring the estimated cost thereof, as near as may be, and specify whether general or utility indebtedness is to be incurred, the amount of such indebtedness, the amount of interest, and so forth.

(2) The initiatory resolution passed in December, 1939, stated the estimated cost as $2,000,000 and the amount of indebtedness to be incurred is $2,000,000.

(3) The statute also provides that the right of eminent domain shall be exercised and instituted pursuant to resolution of the commission and in the same manner as is provided by law for the exercise of that right by incorporated cities and towns in the state of Washington in the acquisition of like property.

(4) Those statutes (Rem. Rev. Stat., §§ 9217, 9218, 9488, and 9489 [P. C. §§ 7547, 7548, 1214, and 1215]) provide that, when the right of eminent domain is exercised, an ordinance shall be passed declaring the necessity, adopting the plan, and declaring the estimated cost thereof, as near as may be, and that the petition to condemn shall contain a copy of that ordinance. Hence, the condemnation petition in this case was required to contain a copy of the initial ordinance, and such copy was in fact attached to the complaint in the condemnation action.

(5) After the jury returned their verdict for $2,227,531 on January 2, 1943, upon which judgment was rendered, and later affirmed, with modifications as to interest on the condemnee's appeal, the district purported to amend or supplement its initial resolution of December, 1939, on November 30, 1944, by another resolution stating the estimated cost at $2,702,000 and changing the amount of indebtedness to be incurred to $2,702,000, to be secured by first lien revenue bonds not to exceed $2,300,000, and second lien revenue bonds not to exceed $402,000.

These are true statements as to the law and the facts. The prayer is that the issue of any bonds, other than in the amount of $2,000,000, be permanently enjoined. If the prayer is granted, it is apparent that all the proceedings taken in the condemnation action since its initiation in December, 1939, must go for naught, for lack of funds to pay the judgment and take the property.

We think that the condemnation *was* conducted pursuant to the resolution. The case was heard, a verdict was returned, judgment was rendered, and that judgment affirmed on appeal to this court. The real question in this case is whether the district could subsequently issue sufficient bonds to acquire funds with which to pay that judgment.

It would seem that the question now raised could, and should, have been raised on the appeal of the condemnation action; for the judgment was $227,531 in excess of the amount stated in the initiatory resolution, and it was known that the district had no way of securing funds other than by issuing bonds. However, the initial resolution provided that the interest rate might be as high as six per cent, and, since it appears that, in November, 1944, $2,702,000 of the district's bonds could be sold for $2,608,943.12, although bearing but three per cent interest, it may be that, on February 4, 1943, when the condemnation judgment was entered, $2,000,000 of six per cent bonds could have been sold at such a premium as to pay the award. We do not know.

But, quite independent of whether or not the appellant power company is foreclosed by not raising the question now raised on its appeal, we think that it has no standing to claim that the district cannot now legally issue bonds for a greater amount than that contemplated in the original resolution. That in no way that we can conceive affects its rights as condemnee. If it receives the amount adjudged to it in the condemnation action, what right has it been denied, and what damage will it suffer? In praying for the injunction *pendente lite,* it was suggested, or rather argued, that, if the district is al-

lowed to sell the bonds, as per its agreement with the Ballard-Hassett Company, and pay for, and take, the property, the bonds may subsequently be declared illegal, and the property may come back on the company's hands, its business disrupted, its employees scattered, and its contractual relations with its customers interfered with, for which damage it can have no possible remedy. As an argument for a stay until this appeal is determined, this has merit, but as an argument for the relief ultimately asked, a permanent injunction, it does not; for this decision will in and of itself obviate those dangers.

█ Nor do we find any merit in the contention made by the individual appellants. Suppose, in the initial resolution, the district had stated the amount of indebtedness to be incurred to be $2,702,000, or, for that matter, $5,000,000. What could they have done about it? Since the bonds to be issued were revenue bonds, no election was necessary. A hearing was not even necessary. A discretion to fix that amount was wholly within the commissioners' powers, not subject to question by anyone whatever. The statute is so exceptionally broad that practically the only restraints on the commissioners of a public utility district as to the amount of bonds to be issued are moral in their nature, as, for example, not to issue bonds in such amounts that there is no surety that they can be serviced and finally retired by such revenue as the utility may be reasonably expected to enjoy.

No fraud is claimed or shown in this case. There is nothing to indicate that the estimated cost stated in the initial resolution was not honestly made. It must be remembered that the estimate was made in December, 1939, and the verdict materially exceeding it was returned in January, 1943. A great deal happened between those dates which may have altered values, among them, the outbreak of the world war. On this question of estimated value, it has been interesting to consult the record in the condemnation case which was formerly here on appeal. It appears that the testimony of the three experts called by the district as to the market value of the property to

be taken was, respectively, as follows: $1,000,000, $1,100,-000, and $1,200,000, while the testimony of the two expert witnesses for the condemnee was: $3,500,000 and $4,000,-000. Under these circumstances, the estimate arrived at by the district three years earlier cannot reasonably be regarded as fraudulent.

 Finally, it must be remembered that an injunction, especially a permanent injunction, will not be granted to restrain acts, however irregular or unauthorized, that occasion no injury to the complainant. It is a familiar principle that the remedy is only available where the injury is actual or positive. It must be a material and actual injury, existing or presently threatened. The condemnee appealed from the judgment entered upon the condemnation verdict, and the judgment was sustained by this court. No fraud has been shown that would warrant the court in setting it aside. It is not open to the condemnee to say now that there was some irregularity in obtaining that judgment which would entitle it to claim damages. It does claim that it is threatened with damage because the district is about to issue bonds in the amount of $2,702,-000; its theory being that that amount was attempted to be authorized by a resolution unlawfully passed on November 30, 1944. It is alleged, in the amended complaint in the action, that, if bonds in that amount are issued, the condemnation may be held void, and that, in that event,

" . . . The Washington Water Power Company, will suffer irreparable damage and injury by being unlawfully dispossessed of its property, by having its business disorganized and disrupted, by having its employees severed from their employment with said plaintiff corporation, and by having its employees forced to seek employment elsewhere, and by having its contractual relations with its customers interrupted and interfered with."

But, if as we are about to do, we hold that the bonds can be lawfully issued, that threatened damage, however sufficient to entitle the condemnee to bring this action, will, from the moment this opinion is filed, no longer have any existence.

Furthermore, the individual appellants have shown no damage or threatened damage. At the hearing in the lower court, it was attempted to show that they would be damaged by the issue of bonds in the sum of $2,702,000. Several were called as witnesses. Mr. Monroe testified that, if the change in the original indebtedness to be incurred was made from $2,000,000 to $2,702,000, he would naturally be damaged, in that it would follow that his bill for electric power would necessarily be greater under the second figure than it would "if the original set-up was carried out." Several others of the individual appellants testified to the same effect; but these witnesses, as counsel for the district pointed out in argument, were not dealing with realities. The "original set-up" obviously can never be carried out. A judgment for $2,227,531 cannot be discharged by a payment of $2,000,000. If additional bonds cannot be issued, the property cannot be taken by virtue of the judgment entered and must remain the property of The Washington Water Power Company, at least until a new condemnation is undertaken and completed, and, as shown earlier in the opinion, it has taken more than five years for this one to arrive at the point which it has now reached. To show any threatened damage to the individual appellants, caused by the issue of bonds in the amount of $2,702,000, it would be necessary to show that, in the future, they would, in such an event, have to pay more for power than they would if the property remained in the ownership of The Washington Water Power Company. Of this there is no evidence or proof.

It is, therefore, our conclusion that, in any event, no damage or threatened damage has been shown that would warrant a court in issuing the permanent injunction which the appellants sought.

The judgment appealed from will stand affirmed. The temporary injunction *pendente lite* will be dissolved upon the filing of this opinion. The cash deposited in the registry to secure the stay orders and temporary injunction will

remain on deposit, subject to the further order of the court. The remittitur in this case will go down forthwith.

BEALS, C. J., BLAKE, JEFFERS, MALLERY, and GRADY, JJ., concur.

STEINERT, J. (dissenting)—The crucial question, on the merits of this appeal, is whether, after judgment has been entered upon remittitur from this court, in a condemnation proceeding, the condemnor, a public utility district, may amend or supplement its formal resolution upon which the condemnation action was based and carried to completion, and then, on the basis of such amended or supplemental resolution, issue its bonds in excess of the amount authorized by the original resolution. I am of the opinion that this cannot lawfully be done.

The right of eminent domain possessed by a public utility district is in all respects statutory and that right must be exercised strictly in accordance with the statute relevant thereto; otherwise, the whole proceeding is void and of no effect. We have repeatedly held that statutes of eminent domain, the acknowledged purpose and object of which are to take from the owner his private property and his rights therein, must be strictly construed. Strong language has been used by this court in the enunciation of that principle.

"The power of eminent domain is a power which interferes with an individual's primary right of use, possession and ownership of property, and we are not inclined to extend this power beyond the plain provisions of the law." Dunbar, J., in *Spokane v. Colby,* 16 Wash. 610, 48 Pac. 248.

"Again, it is the well established and universal law that statutes delegating the right of eminent domain to corporations, being in derogation of common rights, are not to be extended by implication, but are to be strictly construed." Dunbar, J., in *Seattle v. Fidelity Trust Co.,* 22 Wash. 154, 60 Pac. 133.

"Condemnation statutes, overriding, as they do, the high right of private property, and being in derogation of common right, must be strictly construed." Hadley, J., in *State ex rel. Attorney General v. Superior Court for Chelan County,* 36 Wash. 381, 78 Pac. 1011.

"Statutes of eminent domain being in derogation of the common right must be strictly construed, *both as to the extent of the power and as to the manner of its exercise.*" (Italics supplied.) Ellis, J., in *State ex rel. Postal Telegraph-Cable Co. v. Superior Court for Grant County,* 64 Wash. 189, 116 Pac. 855.

Identical or similar statements of this principle are made in *State ex rel. Bremerton Bridge Co. v. Superior Court,* 194 Wash. 7, 76 P. (2d) 990, and *State ex rel. Wirt v. Superior Court,* 10 Wn. (2d) 362, 116 P. (2d) 752.

This principle is so thoroughly embedded in our law and so vitally an element of the "high right of private property" that it is not to be eviscerated or undermined by any so-called rule of "liberal construction" or by any legislative declaration to that effect.

The relevant statutes involved in this proceeding are, as stated in the majority opinion, Rem. Rev. Stat., §§ 11610 (b) and 11611. Section 11610 (b) prescribes the manner in which the right of eminent domain *shall* be "exercised," how it *shall* be "instituted," and how it *shall* be "conducted." The right is to be exercised and instituted by "resolution of the commission" and is to be conducted in the same manner and by the same procedure as is or may be provided for the exercise of the power of eminent domain by incorporated cities and towns of this state. Section 11611 provides that whenever the commissioners of the public utility district shall deem it advisable to acquire by purchase, condemnation, or construction any public utility

". . . the commission *shall* provide therefor by *resolution,* which *shall* specify and adopt the system or plan proposed, and declare the estimated cost thereof, as near as may be, *and specify* whether general or utility indebtedness is to be incurred, *the amount of such indebtedness* . . ." (Italics supplied.)

In both of these sections of the statute the language is mandatory, not directory or permissive. Throughout the condemnation proceeding, from its initiation to the time of final judgment on remittitur from this court, the com-

mission recognized and followed these mandatory requirements. On December 21, 1939, the commission adopted resolution No. 17 entitled

"A RESOLUTION establishing a public utility and providing for the acquisition, by purchase or condemnation, of certain works, plants and facilities for the generation, transmission and distribution of electricity, and the construction of certain additions and betterments thereto and extensions thereof, specifying and adopting a system or plan therefor, creating certain special funds, and authorizing the issuance and sale of revenue bonds *in an amount not exceeding $2,000,000.*" (Italics supplied.)

Section 5 of the resolution provides:

"In order to carry out the plan or system herein specified and adopted, the District shall issue and sell its revenue bonds in an amount *not exceeding $2,000,000.*" (Italics supplied.)

At the same time, the commission adopted resolution No. 18 authorizing its attorneys to commence condemnation proceedings for the acquisition of the property here involved and expressly stating that compensation for the taking of such property and for any incidental damages "shall be" paid and payable *only* from the proceeds of sale of the bonds authorized by resolution No. 17.

Pursuant to these resolutions, and basing its action directly and wholly thereon, the commission instituted a proceeding for the condemnation of the property with which we are here concerned, the resolutions being attached to and made parts of its petition. On June 9, 1941, after an intermediary appeal to this court had been determined, the commission obtained from the superior court a decree adjudging the taking of the property to be a public necessity and for a public use. That decree recited specifically that the taking of the property "is necessary to the carrying out of the system or plan specified and adopted in and by resolution No. 17 of said Public Utility District No. 1 of Okanogan County, adopted December 21, 1939."

On the basis of that same resolution the proceeding was thereafter prosecuted to final judgment entered on Octo-

ber 30, 1944, as directed by this court on a subsequent appeal in the matter.

By the time the final judgment had been entered, resolution No. 17 had accomplished its purpose. It had served as the sole basis for the commencement of the action, and it had set the limits of any bond issue from the proceeds of which the judgment fixing the amount of compensation to the property owner was to be satisfied. In other words, the resolution as such had spent its force and thereafter inhered in the final judgment consequent upon the decree of public necessity and use.

Despite this situation, the commission on November 30, 1944, which was over a month after the above proceeding had been concluded, took the action which has precipitated this controversy. As stated in the majority opinion,

"On November 30, 1944, the district, as a step toward financing the transaction, purported to amend or supplement the resolutions of 1939, upon which the condemnation action was based, by providing for a bond issue of a face value of $2,702,000, a much larger amount [by the sum of $702,000] than that contemplated by the resolutions passed in 1939."

The commission sought to accomplish that objective by passing resolution No. 48, a document consisting of thirty-nine typewritten pages. That resolution began by amending the title to resolution No. 17 so as to authorize the issuance of bonds in a sum not exceeding $2,702,000, instead of $2,000,000. It then specifically repealed a number of sections of the original resolution, amended many others, added twenty new sections, and concluded with a section reciting that "all resolutions or parts of resolutions in conflict herewith, be and the same are hereby repealed." Section 19 of the new resolution provided that the fund thereby created shall be drawn upon solely

" . . . for the purpose of purchasing, *condemning,* constructing, or otherwise acquiring the electric public utility herein provided for, repairs, improvements, extensions and betterments thereto and expenses incurred incidental thereto." (Italics supplied.)

Obviously, the commission and Ballard-Hassett Company, the prospective purchaser of the bonds, thought it necessary to pass resolution No. 48 in order to validate the results of the condemnation proceeding, else they would not have taken the meticulous pains to formulate and pass it. In that conception, I think they were correct, provided the resolution had that legal effect. But it is right at this point that I disagree with respondents' contentions and with the results of the majority opinion.

Resolution No. 17 specified and adopted the system or plan under which the utility was to be acquired, and specified the amount of bonds ($2,000,000) to be issued for that purpose. The provision relative to the issuance of bonds, their purpose, their amount, and their payment was as much a part of the "system or plan" as was the method of acquisition of the utility. *Hansard v. Green,* 54 Wash. 161, 103 Pac. 40; *Uhler v. Olympia,* 87 Wash. 1, 151 Pac. 117, 152 Pac. 998; *Bremerton v. North Pacific Public Service Co.,* 243 Fed. (D. C. Wash.) 980.

It cannot be gainsaid that the chief factor in this entire proposed venture was the cost of the property to be acquired. The figures before us establish the fact that resolution No. 48 proposed an increase of $702,000, resulting from the verdict of the jury. That constituted an increase of thirty-five per cent over the amount prescribed in resolution No. 17. Certainly, that amount must be considered as an impressive sum and a material change from the contemplated cost. Had the commission proposed to raise that amount by general indebtedness bonds, to be voted upon by the residents of the district, it is at least questionable that such proposition would have carried. Since the amount of the bonds and the method of their payment were as much a part of the "system or plan" as was the method of acquisition of the utility, and since there was a material change in a vital part of the "system or plan," it must follow that the "system or plan" as a whole was materially and vitally changed. In my opinion, such change could neither be imposed upon the former resolution, which had been carried through to final judgment, nor find support

in the proceedings already completed. It would, in my opinion, necessitate a new proceeding, based upon the new and different resolution.

The majority opinion advances a suggestion (made by the respondents) and puts forward two reasons upon which the action taken by the commission should be confirmed.

The suggestion is that, under the rule of "liberal construction" prescribed in the legislative act here involved, the provision requiring that the resolution state the amount of the indebtedness to be incurred, is not mandatory but only declaratory "where the funds to be used to pay for the property condemned are to be secured by issuing bonds having no other security behind them than the rosy prospects of the venture." It seems to me that if a bond issue of $2,702,000 has no greater security behind it than the "rosy prospects of the venture," there is all the more reason for an official resolution making known that intention. Implicit in the suggestion is the disquieting thought that the ultimate purchasers and holders of these bonds may some day sustain a shock that will not be so "rosy." Aside from all that, however, the conclusive answer to the suggestion is that the statute, quoted above, categorically states that the resolution *shall* specify the amount of the indebtedness, whether general or utility in character.

The majority opinion then expresses the tentative view that the question now under consideration cannot be raised at this time, since it could, and should, have been raised on the appeal in the condemnation proceeding. Strange to say, respondents in their brief assert that while the condemnee "probably" lost all its rights to restrain the action of the commissioners by its (the condemnee's) failure to appeal from that portion of the judgment in the condemnation case which provided that upon payment of a sum *in excess* of $2,000,000, a decree of appropriation would be entered, still, say the respondents, if the condemnee has not lost its right to thus complain, and if it may raise any question concerning the power of the commissioners to use the money in excess of $2,000,000, that

question should be raised in the condemnation case *at the time the money is paid into court and the decree of appropriation presented to the court for signature.*

In my opinion, that question could not have been raised on the former appeal, for the simple reason that no action had been taken by the commissioners at that time to issue the public utility district's bonds in an amount in excess of $2,000,000. The commission had no assurance at that time that anyone would purchase its bonds aggregating a greater amount. It was not even known that the commission would accept the award of compensation made by the jury. It was not until November 30, 1944, that the commission entered into a final and binding agreement with Ballard-Hassett Company for the purchase and flotation of its bonds in the sum of $2,702,000. It would have been premature for the condemnee to raise the instant question at the time of the former appeal.

Finally, and as the chief reason for its conclusion, the majority opinion declares that if the condemnee receives the full amount adjudged to it in the condemnation proceeding, it will have been denied no right, nor will have suffered any damage. With reference to the appellants other than the condemnee, the majority opinion takes the further position that the powers of the commission are so broad and untrammeled that it could have fixed the amount of bonds to be issued at any figure it desired, even to the extent of $5,000,000; that such action would not have been subject to review by anyone whomsoever; and that the only restraint upon the commission was of a moral nature, "as, for example, not to issue bonds in such amounts that there can be no surety that they can be serviced and finally retired by such revenue as the utility may be reasonably expected to enjoy."

First, with respect to the rights and remedies of the condemnee, the principal appellant: The condemnee was not concerned alone with the amount of compensation to be awarded to it by the jury for the appropriation of its property. It was not a willing vendor seeking a purchaser of a utility which it was then successfully operating; to

the contrary, it was vigorously resisting every effort to deprive it of its ownership, use, and control of the property. In short, its chief concern was in the retention of its property, not in the amount it was to receive for its appropriation. It therefore had the right, and has the right now, to insist that if its property be condemned under the provisions of the statute, the proceeding must be strictly in accordance with such provisions. That right is so intimately and vitally connected with the right of property itself, that without the one the other is seriously jeopardized. If the venture upon which the commission is about to proceed is so highly profitable—so "rosy" in prospect—it would be at least equally so to its present owner. At present market prices of property and at present rates of interest for money, where can it obtain a return comparable to its present investment? Undoubtedly, under our constitution and statute, the commission has the right to condemn and appropriate the property, but in doing so it should be held to comply strictly with the statute.

Second, with reference to the other appellants: True it is that the commission has vast and sweeping, almost unlimited, power, in the matter of conducting the utility and of issuing bonds in the acquisition thereof. However, there is something more concrete than a mere moral restraint upon its activities. The members of that body could not long withstand public opinion in the community contrary to their activities. Their tenure of office is but three years, and already, as the record shows, there have been changes in the personnel of the commission. The right of recall is also a deterrent against a course of conduct which does not receive the endorsement of the general public. The power of the commission is not so unfettered as it might at first blush seem to be.

Believing as I do that the amended resolution furnishes no basis for further steps in the condemnation proceeding and confers no authority upon the commission for the issuance of bonds in excess of $2,000,000, I am constrained to dissent from the majority opinion.

MILLARD and SIMPSON, JJ., concur with STEINERT, J.