[No. 72598-5. En Banc.]
Argued November 19, 2002. Decided December 18, 2003.

JESSICA BRAAM, ET AL., *Respondents*, v. THE STATE OF
WASHINGTON, ET AL., *Appellants*.

*Kelly Corr* and *Kelsey L. Joyce* (of *Corr Cronin, L.L.P.*) and *Christine O. Gregoire, Attorney General*, and *Jeffrey A.O. Freimund* and *William L. Williams, Senior Counsel*, for appellants.

*Timothy C. Farris* (of *Brett & Daugert, P.L.L.C.*) and *Casey Trupin* and *John B. Midgley* (of *Columbia Legal Services*) (*William Grimm* of *National Center for Youth Law*, of counsel), for respondents.

*Donald B. Scaramastra* and *Kimberly D. Ambrose*, amici curiae.

CHAMBERS, J. — This class action was brought against the Department of Social and Health Services (DSHS or State) in an effort to improve the lives of foster children in the State's care. Among other things, the respondents seek to force DSHS through a variety of legal claims to drastically reduce the number of times foster children are moved while in the State's care. Most of the claims were dismissed before or during trial, and the case went to the jury on whether the class's claimed substantive due process right to "the exercise of professional judgment, standards or practices" had been violated. The jury made two findings: (1) that the class's constitutional rights, as defined in the jury instructions, had been violated and (2) that the violation had harmed the class. Based on that verdict and additional findings made by the trial judge, a broad injunction substantially governing the State's foster care system was entered.

Today we must decide whether the court below mistook the appropriate substantive due process standard of care for the right itself. We are also asked to decide whether the trial court properly dismissed certain state and federal statutory claims, whether the injunction was overly broad, whether the class should be judicially estopped from changing its articulation of the alleged substantive due process right, and to resolve several procedural and evidentiary issues.

We hold that the jury was incorrectly instructed on the foster children's substantive due process rights. We reverse in part, affirm in part, and remand for further proceedings consistent with this opinion.

## FACTS

Washington's foster care system is charged with the sad duty of caring for children whose families are unable to do so. Ch. 13.34 RCW; ch. 74.13 RCW; *see generally* Report of Proceedings (RP) at 1580-82, 2054-55. Many of the children entering into foster care have been severely abused. Many have been physically or emotionally neglected. Some children in foster care are moved frequently, which may create or exacerbate existing psychological conditions, notably reactive attachment disorder.[1] The Washington State Legislature has specifically recognized that "[p]lacement disruptions can be harmful to children by denying them consistent and nurturing support." RCW 74.13.310.

Children's advocates across the nation began bringing litigation decades ago in an attempt to force states to improve their foster care systems.[2] In August 1998, respondents joined the fray, filing this lawsuit in Whatcom County Superior Court, originally seeking money damages in tort for injuries to foster children. Two years later, the plaintiffs added a claim for injunctive relief and sought certification as a class action. The class eventually certified included "[a]ll children who are now (or who in the future will be) in the custody of the Department of Health and Social Services foster care system and who while in DSHS custody are placed by the Defendants in three or more placements." Clerk's Papers (CP) at 275. The tort claims of the named plaintiffs were settled before trial. Ultimately, only injunctive relief was sought.

---

[1] Reactive attachment disorder is associated with grossly inadequate care or a failure to form attachments to caregivers, and can be debilitating. *See* AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS: DSM--IV-TR 127-30 (4th ed. 2000).

[2] *See, e.g., Brian A. ex rel. Brooks v. Sundquist*, 149 F. Supp. 2d 941, 944 (M.D. Tenn. 2000); *LaShawn A. v. Dixon*, 762 F. Supp. 959, 996 (D.D.C. 1991); *See also* Roberta Nestaas & Steve Wickmark, *Appealing Jury Verdict Against DSHS Will Delay Getting Help To Kids In Need*, SEATTLE POST-INTELLIGENCER, Jan. 20, 2002, at D9. At oral argument, counsel for the State indicated that he knew of at least 17 similar cases brought in other states, most of which had ended in consent decrees and are unavailable to this court to guide our analysis.

The trial court dismissed all claims based on procedural due process, 42 U.S.C. § 675(5)(C) and the Washington State Constitution. It also dismissed most of the claims based on state and federal child welfare and disability statutes. However, the trial judge denied the State's motion for summary judgment on the class's substantive due process claim. The trial court also made several evidentiary rulings before trial, limiting the State's use of evidence of fiscal constraints, and denying the State's motion to exclude three named plaintiffs who had "aged out" of the class.

The parties agreed to try this case to a jury and to be bound by its verdict.[3] During trial, the court denied a motion to decertify the class and dismissed most of the plaintiffs' remaining statutory claims. Over the State's objection, the court allowed the plaintiffs to refer to those and other statutes and to state regulations during the trial as evidence of the State's duties.

After the plaintiffs rested, the court dismissed the remaining statutory claims, the three named plaintiffs about whom no testimony was presented, and all claims against former DSHS Secretary Lyle Quasim. The court denied a motion to restrict the class to children with at least five placements.

Meanwhile, characterization of the substantive due process right at issue had changed. The plaintiffs' first clear articulation of the right came in opposition to the State's summary judgment motion on the substantive due process claims:

> The first [substantive due process] claim alleges that child abuse and neglect victims placed in the state's custody are entitled to be free from harm and that such harm encompasses both physical injury and mental and/or psychological harm. *The injury of which plaintiff's* [sic] *complain is caused primarily by defendants' pattern and practice of indiscriminately*

---

[3] A jury trial for equitable relief is permitted by CR 39(c) ("In all actions not triable of right by a jury the court . . . may, with the consent of both parties, order a trial with a jury whose verdict has the same effect as if trial by jury had been a matter of right.").

*moving children from one placement to another like so much chattel.* The second claim asserts that foster children must be provided with health care while in state custody and that their entitlement to such treatment includes a right to care for their serious mental health problems.

CP at 2256-57 (Pls.' Mem. in Opp'n to Mot. to Dismiss Substantive Due Process Claims) (emphasis added) (footnotes omitted). At that point, it appears that the State and the trial court both understood the class's theory was that substantive due process prohibited frequent placement changes. *See, e.g.*, RP at 3073-74.

In court before the jury on October 29, 2001, the plaintiffs argued "the right of children to a safe, stable and permanent home and the constitutional right to be free from harm." RP at 775. The trial court and the State both believed that was a correct description of the class's substantive due process theory. *See, e.g.*, RP at 3072-74.

When all the evidence was in and both sides had rested, the plaintiffs informed the court they had concluded it would be error to instruct on the constitutional right to "safe, stable, and permanent homes." RP at 3072. Instead, the plaintiffs suggested instructing on the right to "adequate treatment . . . substantially comporting to professional standards." *Id.* (citing *Youngberg v. Romeo*, 457 U.S. 307, 324, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982)). Both the State and the court expressed surprise. The court said, "I have had in my mind all along that [the right to safe, stable, and permanent homes] is what we have been talking about." RP at 3073. The State excepted to the instruction, arguing "*Youngberg* . . . is the burden . . . not . . . the right." RP at 3079. The trial court substantially adopted the plaintiffs' position and issued its final jury instructions, defining the liberty interest as follows:

> The plaintiff class claims that the defendants violated, or will violate, their constitutional rights to substantive due process to be treated in a manner which does not substantially depart from professional judgment, standards or practice.

CP at 751 (Jury Instruction 7). The jury was ultimately asked to render a verdict on two questions: whether the constitutional rights of the plaintiff class were violated, and, if so, whether the violation was the proximate cause of the harm claimed by the class. After a day of deliberation, the jury returned a verdict for the plaintiffs. *Id.* Later, the trial court made five additional findings of fact:

1. Children are harmed by being subjected to unnecessary multiple placements.
2. Foster parents are inadequately trained, informed and supported to provide proper care for children in the class.
3. Children are denied necessary mental health care (assessments and treatment).
4. Children are placed in unsafe placements (DSHS offices, homes of sexual offenders, violent offenders and held in detention/jails).
5. Children are separated from their siblings.

CP at 143.

Based on the jury's verdict and the additional findings, the trial court entered a broad injunction, mandating the recruitment of new foster parents, notification prior to placement changes, arrangements to improve education, additional training and institutional support of foster parents, and increased emphasis on the preservation of sibling relationships. The court further ordered DSHS to desist immediately from holding foster children in unsafe placements. The court ordered plaintiffs' counsel to monitor compliance and retained jurisdiction until satisfied that "there is no reasonable possibility of recurrence of the unconstitutional conditions identified." CP at 153. DSHS estimates that implementation of the injunction would cost $60,408,400. App. to Br. of Appellants A-41.

The State appealed and moved for an emergency stay of the injunction. The Court of Appeals stayed implementation of most of the injunction, leaving in place some orders relating to unsafe placements, and certified the appeal to this court. We accepted review.

## ANALYSIS

### I. Substantive Due Process

#### A. *The Right*

First, we must decide whether foster children possess substantive due process rights that the State, in its exercise of executive authority, is bound to respect. We hold that they do.

In this, we do no more than follow the weight of authority among our sister courts. *See, e.g., Roska v. Peterson,* 304 F.3d 982, 994 (10th Cir. 2002); *Charlie H. v. Whitman,* 83 F. Supp. 2d 476, 507 (D.N.J. 2000) (recognizing substantive due process right "to reasonable protection from harm and . . . to receive care, treatment and services consistent with competent professional judgment"); *Jordan v. City of Phila.,* 66 F. Supp. 2d 638, 646 (E.D. Pa. 1999) (collecting cases recognizing substantive due process rights of foster children); *Yvonne L. ex rel. Lewis v. N.M. Dep't of Human Servs.,* 959 F.2d 883, 893 (10th Cir. 1992) (holding that the constitutional right of foster children to be reasonably safe from harm was clearly established); *K.H. ex rel. Murphy v. Morgan,* 914 F.2d 846, 851 (7th Cir. 1990) (holding that the State may not place a child in danger and that "[i]t should have been obvious from the day *Youngberg* was decided that a state could not avoid [its] responsibilities . . . merely by delegating custodial responsibility to irresponsible private persons"); *Aristotle P. v. Johnson,* 721 F. Supp. 1002, 1009 (N.D. Ill. 1989) (due process right " 'to be free from unreasonable and unnecessary intrusions upon their physical and emotional well-being, while directly or indirectly in state custody, and to be provided by the state with adequate food, shelter, clothing and medical care' " (quoting *B.H. v. Johnson,* 715 F. Supp. 1387, 1396 (N.D. Ill. 1989))); *Taylor ex rel. Walker v. Ledbetter,* 818 F.2d 791, 795 (11th Cir. 1987) (declaring that like the plaintiff in *Youngberg,* foster children are "involuntarily placed . . . in a custodial environment, and . . . unable to seek alternative living arrange-

ments."); *Doe v. N.Y. City Dep't of Soc. Servs.*, 649 F.2d 134, 141-42 (2d Cir. 1981) (holding that a child in state custody has a constitutional right not to be placed in a foster care setting known to be unsafe); *cf. DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 201, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989).

We must harmonize these positive articulations of constitutionally protected rights of foster children with the fact that "the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *County of Sacramento v. Lewis*, 523 U.S. 833, 849, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998).

■ Modern substantive due process jurisprudence requires a " 'careful description' of the asserted fundamental liberty interest." *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). We conclude that at its core, substantive due process gives foster children a right to be free from unreasonable risk of harm, including a risk flowing from the lack of basic services, and a right to reasonable safety. *Roska*, 304 F.3d at 994[4]; *see also K.H.*, 914 F.2d at 852 (due process right "not to be handed over by state officers to a foster parent or other custodian, private or public, *whom the state knows or suspects to be a child abuser.*"); *Kara B. v. Dane County*, 205 Wis. 2d 140, 152, 555 N.W.2d 630 (1996) (right to a "reasonably safe and secure placement"); *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 476 (6th Cir. 1990) (substantive due process right to be free from unreasonable harm); *cf.* BLACK'S LAW DICTIONARY 1336, 398-99 (7th ed. 1999) (defining "safe" and "danger"); *but cf. Mark G. v. Sabol*, 93 N.Y.2d 710, 726, 717 N.E.2d 1067, 695 N.Y.S.2d 730 (1999) (no substantive due process right to family social services before placement or during placements). Exposure of the

---

[4] We caution that this broad substantive due process right is not a back door for constitutionalizing all tort claims, as the United States Supreme Court has repeatedly warned against. Nor does it create a right to services not reasonably necessary in protecting the child from harm.

child to an unreasonable risk of harm violates the substantive due process clause. "Harm" is to be given its ordinary meaning of physical or mental damage. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1034 (1993); *cf.* BLACK'S, *supra*, at 722.

The State has given us no compelling reason to part company with our brethren courts, and we accordingly recognize and adhere to the weight of authority that foster children have substantive due process rights the State is bound to respect. We hold that foster children have a constitutional substantive due process right to be free from unreasonable risks of harm and a right to reasonable safety. To be reasonably safe, the State, as custodian and caretaker of foster children, must provide conditions free of unreasonable risk of danger, harm, or pain, and must include adequate services to meet the basic needs of the child.

## B. *Culpability Standard*

Next, we must decide the appropriate culpability standard for measuring alleged violations of the substantive due process rights of foster children. The United States Supreme Court has articulated two standards that have been applied by lower courts: deliberate indifference and professional judgment. *Lewis*, 523 U.S. 833; *Youngberg*, 457 U.S. 307; *see generally* Matthew D. Umhofer, *Confusing Pursuits*: Sacramento v. Lewis *and the Future of Substantive Due Process in the Executive Setting*, 41 SANTA CLARA L. REV. 437 (2001). Something more than negligence is required. Ultimately, substantive due process is violated if the executive action shocks the court's conscience; both standards are tailored to assist courts in evaluating executive action in specific factual contexts. *E.g., Lewis*, 523 U.S. at 847 n.8.

DSHS argues that plaintiffs are required to show that the State's conduct either shocks the conscience or was deliberately indifferent to their rights. It asks for remand for reconsideration under one of those standards. The class

argues that the trial judge was correct and the professional judgment standard is appropriate. Under the professional judgment standard, plaintiffs must prove that the action was such a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323.

No contemporary court has attempted to determine whether state conduct toward those in the State's custody is constitutionally "conscience shocking" without recourse to either the deliberate indifference standard or the exercise of professional judgment standard. We conclude that the proper inquiry is whether the State's conduct falls substantially short of the exercise of professional judgment, standards, or practices. *See Brian A. ex rel. Brooks v. Sundquist*, 149 F. Supp. 2d 941, 953-54 (M.D. Tenn. 2000)[5]; *Jordan*, 66 F. Supp. 2d at 646 (extending professional judgment standard to foster children); *Charlie H.*, 83 F. Supp. 2d at 507 (same); *cf.* 53 AM. JUR. 2D *Mentally Impaired Persons* § 103, at 555 (1996). However, we will briefly survey the arguments for both approaches.

First, we consider the State's contention that *Lewis*, 523 U.S. 833, governs. *Lewis* considered the substantive due process implications of a police chase that ended in the death of a motorcycle passenger. The Supreme Court found a colorable claim, but found no substantive due process violation because the officer's conduct was not so egregious as to be constitutionally conscience shocking. *Id.* at 847. *Lewis* held that the appropriate standard to be applied

---

[5] Illustrative is this treatise on a related area of law:

In determining whether a state has adequately protected an involuntarily committed person's constitutional liberty interests in reasonable care and safety, reasonably nonrestrictive confinement conditions. and such training as may be required by these interests, decisions made by an appropriate professional as to what is reasonable are entitled to presumption of correctness and validity, and liability may be imposed only when the professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.

53 AM. JUR. 2D *Mentally Impaired Persons* § 103, at 555 (1996) (footnote omitted).

would depend in part on history, contemporary practice, due respect for the executive, and the general standards of blame. *Lewis*, 523 U.S. at 847 n.8.

Applying similar principles, federal appellate courts have consistently held that conduct deliberately indifferent to the substantive due process rights of detainees violates the Constitution. *See, e.g., Roska*, 304 F.3d at 994; *Nicini v. Morra*, 212 F.3d 798, 811 (3d Cir. 2000); *Kitzman-Kelley v. Warner*, 203 F.3d 454, 458 (7th Cir. 2000); *White v. Chambliss*, 112 F.3d 731, 737 (4th Cir. 1997); *Meador*, 902 F.2d at 476; *Taylor* at 796; *Doe*, 649 F.2d at 141. Put another way, the "deliberate indifference" standard is the minimum standard of care required to meet the State's substantive due process duties toward those it has placed in its custody.

More relevant to the case at bar, many courts applying these principles have concluded that the deliberate indifference test is not well calibrated to the substantive due process claims of foster children. We find compelling the reasons advanced by these courts.

First, the federal cases that have applied the "deliberate indifference" standard to the substantive due process rights of foster children have been in the context of the limited question of whether individual state actors were entitled to qualified immunity in a 42 U.S.C. § 1983 suit. Whether and when qualified immunity is available to state actors triggers a consideration of issues not before us.

Secondly, and more importantly, we note that none of the appellate courts cited by the State *held* that "deliberate indifference" was the appropriate standard. Instead, those courts applied the standard presented to them by the parties. Several of the federal courts explicitly qualified that they were *not* deciding the standard for injunctive relief, or that they had not been asked to consider a professional judgment standard. *See, e.g., Nicini*, 212 F.3d at 811 n.9; *K.H.*, 914 F.2d at 854. And in fact, outside of the § 1983 context, the culpability standard has been more precisely calibrated in cases involving foster children. *See,*

*e.g., Kara B.*, 205 Wis. 2d at 158; *cf. Lewis*, 523 U.S. at 847 n.8 (appropriate standard will vary by context).

Finally, we note that most cases that have specifically addressed the issue have applied the professional judgment standard. *Kara B.*, 205 Wis. 2d at 158; *LaShawn A. v. Dixon*, 762 F. Supp. 959, 996 (D.D.C. 1991); *accord Neiberger v. Hawkins*, 239 F. Supp. 2d 1140, 1149 (D. Colo. 2002).

Accordingly, we hold that "deliberate indifference" is not well suited for analyzing the claims of the class. Foster children are entitled to a high standard. *Accord Brian A.*, 149 F. Supp. 2d at 953-54. Something more than refraining from indifferent action is required to protect these innocents.

The plaintiffs argue for the professional judgment standard of *Youngberg*, 457 U.S. at 323. That would allow them to present proof that the decisions they complain of, while not deliberately indifferent to their substantive due process rights, were not the product of professional judgment. We find compelling the reasoning of the Wisconsin Supreme Court, which found "that those entrusted with the task of ensuring that children are placed in a safe and secure foster home owe a constitutional duty that is determined by a *professional judgment standard.*" *Kara B.*, 205 Wis. 2d at 158 (emphasis added). We agree. Foster children, because of circumstances usually far beyond their control, have been removed from their parents by the State for the child's own best interest. More often these children are victims, not perpetrators. Foster children need both care and protection. The State owes these children more than benign indifference and must affirmatively take reasonable steps to provide for their care and safety. *See, e.g., Brian A.*, 149 F. Supp. 2d at 953-54. As one court noted:

> The foster children that make up the plaintiff class in this case have done society no wrong and . . . [i]t would be inappropriate to force them to endure constitutional deprivations absent a showing of "deliberate indifference" by their caretakers. At the same time, it would be inappropriate to hold caretakers liable

for constitutional deprivations when those caretakers had exercised their professional judgment in determining the best course of conduct.

*LaShawn A.*, 762 F. Supp. at 996; *accord In re Det. of J.S.*, 124 Wn.2d 689, 700, 880 P.2d 976 (1994) (applying the professional judgment standard to alleged deprivations of substantive due process rights in the mental health setting); *Brian A.*, 149 F. Supp. 2d at 953-54. We concur.

We note that mechanical application of this test, however, is impracticable and has been rejected by the United States Supreme Court. The test for whether a particular action shocks the conscience must be appropriately tailored to the factual context at hand and "must be determined by balancing . . . liberty interests against the relevant state interests." *Youngberg*, 457 U.S. at 321. In order to preserve "constitutional proportions of substantive due process," a court must undertake "an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Lewis*, 523 U.S. at 850. This standard best allows for such a nuanced inquiry.

We hold that the appropriate culpability standard is the professional judgment standard, i.e., the exercise of professional judgment made in accord with accepted professional standards or practice. The State, as the custodian and caretaker of these children, is therefore liable for the harm allegedly caused by a violation of a foster child's substantive due process right to be free from unreasonable risk of harm and to reasonable safety only when his or her care, treatment, and services "substantially depart from accepted professional judgment, standards or practice."

## II. The Jury Instructions

We must now determine whether the jury instructions incorrectly stated the law by mistaking the right for the culpability standard, and, if so, whether reversal is warranted. The relevant jury instructions state:

The plaintiff class claims that the defendants violated, or will violate, their constitutional rights to substantive due process to be treated in a manner which does not substantially depart from professional judgment, standards or practice.

CP at 751 (Jury Instruction 7).

To establish a claim under the United States Constitution, the plaintiff class must prove . . . .

First, that the defendants persistently and substantially departed from the exercise of professional judgment, standards or practice by engaging in a widespread pattern or practice of depriving the plaintiff class of the rights secured by the Constitution of the United States to be treated in a manner which does not substantially depart from professional judgment, standards or practice.

CP at 752 (Jury Instruction 8). The verdict form asked the jury to decide two questions:

Question No. 1: Were the constitutional rights of the plaintiff class violated?

Answer: X yes ___ No

. . . .

Question No. 2: Was such violation a proximate cause of the harm to the plaintiff class in one or more ways claimed by plaintiffs?

Answer: X yes ___ No

CP at 759. Effectively, the jury was instructed that the substantive due process clause created a right to treatment "which does not substantially depart from professional judgment, standards or practice" to be measured against whether the State "persistently and substantially departed from the exercise of professional judgment, standards or practice." The jury was incorrectly instructed because the instructions confounded the substantive due process right with the standard of culpability to be applied.

We do not find the error harmless. Properly, the jury should have been asked first to determine whether specific decisions of DSHS violated the foster children's right to be

free from unreasonable risk of harm or violated their right to reasonable safety. Second, the jury should have been asked if the plaintiffs had established that the decisions substantially departed from accepted professional judgment, standards, or practice. If the decisions did not substantially depart from accepted professional judgment, standards, or practice, then the substantive due process clause was not offended, even if harm resulted to an individual child. *Cf. Lewis*, 523 U.S. 833 (death of a motorcycle passenger not a substantive due process violation under the circumstances); *Glucksberg*, 521 U.S. at 719-21. We therefore reverse and remand for further proceedings consistent with this opinion.[6]

### III. Evidence of Professional Judgment, Standards, or Practice

■ Some of the remaining contentions will undoubtedly resurface on remand. Therefore, we will address them briefly. *Cf. Carrick v. Locke*, 125 Wn.2d 129, 140, 882 P.2d 173 (1994). Both the class and the State argue that the trial court committed evidentiary errors. Claimed evidentiary error is reviewed for abuse of discretion. *Davis v. Globe Mach. Mfg. Co.*, 102 Wn.2d 68, 76, 684 P.2d 692 (1984). Discretion is abused when the "exercise of discretion is manifestly unreasonable or based upon untenable grounds or reasons." *Davis*, 102 Wn.2d at 77 (citing *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 482 P.2d 775 (1971)).

All evidence at issue was offered by one side or the other to establish the appropriate professional standard to measure DSHS's conduct.

---

[6] We note that the parties agreed below to be bound by a jury. Because relief at this point is solely equitable, the parties are not entitled to a jury trial. *Brown v. Safeway Stores, Inc.*, 94 Wn.2d 359, 365, 617 P.2d 704 (1980).

## A. *Was Evidence from Other States Properly Excluded?*

Evidence of standards, practices, and comparisons with other states was excluded. We affirm in part and reverse in part.

■ The State offered statistical data tending to show that Washington meets or exceeds the standards in other states. We find no abuse of discretion in excluding any evidence that was merely statistical or demographic.

■ However, we hold that evidence of actual professional standards followed by other states is properly admissible on remand. We find compelling United States Supreme Court precedent. In a substantive due process challenge to a New York statute that allowed pretrial detention of juveniles considered a "flight risk," the Court specifically found that standards and practices in other states were relevant to the standard of care required by the substantive due process clause. *Schall v. Martin*, 467 U.S. 253, 268, 104 S. Ct. 2403, 81 L. Ed. 2d 207 (1984). " 'The fact that a practice is followed by a large number of states is not conclusive in a decision as to whether that practice accords with due process, but it is plainly worth considering in determining whether the practice "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." ' " *Schall*, 467 U.S. at 268 (finding no substantive due process violation) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S. Ct. 330, 78 L. Ed. 674 (1934), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1, 5, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)).

The class argues that the standards in other states are irrelevant and properly excluded because, they claim, other states' practices fall beneath the constitutional standard, and therefore the trial would have been prolonged unnecessarily by discussion of whether the other states met constitutional standards. However, the United States Supreme Court has clearly held that the standards and practices in other states are relevant to the standard of care required by the substantive due process clause. *Schall*, 467

U.S. at 268. Given that, it is clearly relevant. The class may, of course, attempt to prove that these practices fall below the constitutionally required standard of care.

### B. *Was Evidence of Aspirational Standards Properly Admitted?*

■ The trial court admitted evidence of aspirational standards for foster care promulgated by the Child Welfare League of America and the American Academy of Pediatrics.[7] The State contends that aspirational standards are not relevant to whether constitutionally mandated standards have been met under *Youngberg*, 457 U.S. at 324 (discussing the right to *adequate* treatment substantially conforming to professional standards). We agree that mere aspirational goals are not evidence of accepted professional judgment, practice, or standards. *E.g., United States v. Commonwealth* 902 F. Supp. 565, 584 (W.D. Pa. 1995) ("Optimal courses of treatment as determined by some expert, while laudable, do not establish the minimal constitutional standard."); *see also Wendy H. ex rel. Smith v. City of Phila.*, 849 F. Supp. 367, 372 (E.D. Pa. 1994). We conclude that, based upon the record before us, it was an abuse of discretion for the trial court to admit these aspirational standards.

### C. *Was Evidence of Past DSHS Conduct Properly Admitted?*

■ DSHS claims that evidence of abandoned practices was improperly admitted to prove prior conditions. Injunctive relief is prospective and requires evidence of current violations. *Rumbolz v. Pub. Util. Dist. No. 1 of Okanogan County*, 22 Wn.2d 724, 734, 157 P.2d 927 (1945) ("It is a familiar principle that the remedy is only available where the injury is . . . existing or presently threatened."). Evidence of past occurrences is relevant to injunctive relief

---

[7] Evidence of standards promulgated by the Counsel on Accreditation was admitted at trial. DSHS does not challenge these standards on appeal.

only insofar as it tends to show an ongoing or future likelihood of harm.

An injunction is inappropriate if it is absolutely clear that behavior will not reoccur, but courts must "beware of efforts to defeat injunctive relief by protestations of reform." *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 312, 553 P.2d 423 (1976). As the United States Supreme Court noted:

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power. In this case the city's repeal of the objectionable language would not preclude it from reenacting precisely the same provision if the District Court's judgment were vacated. The city followed that course with respect to the age restriction, which was first reduced for Aladdin from 17 to 7 and then, in obvious response to the state court's judgment, the exemption was eliminated. There is no certainty that a similar course would not be pursued if its most recent amendment were effective to defeat federal jurisdiction.

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S. Ct. 1070, 71 L. Ed. 2d 152 (1982) (footnotes omitted). We agree. The State has not shown abuse of discretion in permitting evidence of past practices, given the distinct possibility that such practices could occur again.

### D. *Was Evidence from the Ombudsman Properly Admitted?*

 The court admitted, over the State's objection, the annual report of the Office of the Family and Children's Ombudsman. DSHS argues that admittance was precluded by statute, and use of the report for the truth of the anonymous facts presented was hearsay. We agree that the ombudsman's report should have been excluded.

The legislature created the Office of the Family and Children's Ombudsman "for the purpose of . . . identifying system issues and responses for the governor and the legislature to act upon, and monitoring and ensuring compliance" with law, regulations and policies promulgated to protect children and families. RCW 43.06A.010. Information collected by the ombudsman is confidential and exempt from discovery:

> Neither the ombudsman nor the ombudsman's staff may be compelled, in any judicial or administrative proceeding, to testify or to produce evidence regarding the exercise of the official duties of the ombudsman or of the ombudsman's staff. All related memoranda, work product, notes, and case files of the ombudsman's office are confidential, are not subject to discovery, judicial or administrative subpoena, or other method of legal compulsion, and are not admissible in evidence in a judicial or administrative proceeding. This section shall not apply to the legislative oversight committee.

RCW 43.06A.060. RCW 43.06A.080 has four exclusions. It allows the ombudsman to report crimes, threats of imminent serious harm, general information regarding the operation of the ombudsman's office, and failures of those required to report child abuse under RCW 26.44.030. It does not allow the annual report to be admitted into evidence. Further, the class relied heavily on the report to prove past occurrences, which deprived DSHS of the ability to challenge the underlying facts. It was an error of law to admit the report.

## E. *Was Evidence of Fiscal Constraints Properly Excluded?*

■ The trial court partially excluded evidence of fiscal constraint and lack of funding as a defense to the claim that the class's constitutional rights were violated. Lack of funds does not excuse a violation of the Constitution, and this court can order expenditures, if necessary, to enforce constitutional mandates. *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 389, 932 P.2d 139 (1997).

 The State, relying on *In re Detention of J.S.*, 124 Wn.2d 689, argues that testimony of budget constraints should have been admitted to show compliance with the relevant standard. The State misreads *J.S. J.S.* merely holds that, *above* a constitutional threshold, cost is relevant to whether professional judgment has been exercised. But *J.S.* does not stand for the proposition that cost defeats a claim to constitutionally adequate treatment. "Thus, the constitutionally significant issue is not whether the optimal course of treatment must be followed, but whether a course of treatment is adequate and reasonably based on professional judgment." *Id.* at 700. The trial court below properly followed *J.S.* and did not permit the State to advance lack of funds as a defense but did permit the State to offer testimony about how a lack of resources *"affects the State's exercise of professional judgment in a particular activity."* CP at 847. The trial court's judgment is affirmed.

## IV. Enforceable Statutory Rights

 The trial court dismissed all of the class's statutory claims. This is reviewed de novo. *Kent Farms, Inc. v. Zurich Ins. Co.*, 140 Wn.2d 396, 399, 998 P.2d 292 (2000).

### A. *Washington State Statutes*

 We affirm the trial court's dismissal of claims based on RCW 74.14A.050(2) and (3), RCW 74.13.250 and .280. None of these statutes explicitly creates a private cause of action. The issue is whether a private cause of action is implied. This court has adopted a three-part test to determine whether a statute impliedly creates a cause of action: "first, whether the plaintiff is within the class for whose 'especial' benefit the statute was enacted; second, whether legislative intent, explicitly or implicitly, supports creating or denying a remedy; and third, whether implying a remedy is consistent with the underlying purpose of the legislation." *Bennett v. Hardy*, 113 Wn.2d 912, 920-21, 784 P.2d 1258 (1990). This test has also been applied to deter-

mine whether injunctive relief is available. *See, e.g., Wash. State Coalition for the Homeless v. Dep't of Soc. & Health Servs.*, 133 Wn.2d 894, 912, 949 P.2d 1291 (1997).

We find that all of these statutes are for the especial benefit of foster children. However, we find no evidence of legislative intent to create a private cause of action, and that implying one is inconsistent with the broad power vested in DSHS to administer these statutes. We note that parties believing themselves aggrieved by DSHS's failure to abide by these statutes, including a foster child through an attorney or guardian ad litem, will have an opportunity to raise the issue in the context of dependency actions. *See, e.g.*, RCW 13.34.120, .130; *cf. Wilmot v. Kaiser Aluminum & Chem. Corp.*, 118 Wn.2d 46, 61, 821 P.2d 18 (1991) (finding relevant, but not conclusive, the existence of other remedies). The trial court's dismissal of claims based on these statutes is affirmed.

## B. *Federal Statutes*

We also affirm the trial court's dismissal of claims based on 42 U.S.C. §§ 671(a)(16) and 675(1) of the federal Child Welfare Act (CWA).

The CWA, enacted pursuant to Congress's spending clause authority, allows states to apply for federal funds to support their health and human services programs, so long as they meet certain federal standards. *Suter v. Artist M.*, 503 U.S. 347, 112 S. Ct. 1360, 118 L. Ed. 2d 1 (1992). There is no explicit cause of action in the CWA; we recognize that courts around the country are divided on whether a cause of action is implied or maintainable under 42 U.S.C. § 1983. *Compare Suter*, 503 U.S. 347 (finding no implied cause of action in 42 U.S.C. § 671(a)(15)) *with Occean v. Kearney*, 123 F. Supp. 2d 618, 625 (S.D. Fla. 2000) (finding privately enforceable right implied in 42 U.S.C. § 671(a)(16)); *see generally* G.M. Beuchlein, *Actions under 42 U.S.C.A. § 1983 for Violations of Adoption Assistance and Child Welfare Act*, 93 A.L.R. FED. 314 (1989).

The relevant portion of the CWA reads:

**State plan for foster care and adoption assistance**

**(a) Requisite features of State plan**

In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which—

. . . .

(16) provides for the development of a case plan (as defined in section 675(1) of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in section 675(5)(B) of this title with respect to each such child.

42 U.S.C. § 671(a)(16). Section 675(1) states:

As used in this part or part B of this subchapter:

(1) The term "case plan" means a written document which includes at least the following:

(A) A description of the type of home or institution in which a child is to be placed, including a discussion of the safety and appropriateness of the placement and how the agency which is responsible for the child plans to carry out the voluntary placement agreement entered into or judicial determination made with respect to the child in accordance with section 672(a)(1) of this title.

(B) A plan for assuring that the child receives safe and proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own safe home or the permanent placement of the child, and address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child under the plan.

(C) To the extent available and accessible, the health and education records of the child, including—

(i) the names and addresses of the child's health and educational providers;

(ii) the child's grade level performance;

(iii) the child's school record;

(iv) assurances that the child's placement in foster care takes into account proximity to the school in which the child is enrolled at the time of placement;

(v) a record of the child's immunizations;

(vi) the child's known medical problems;

(vii) the child's medications; and

(viii) any other relevant health and education information concerning the child determined to be appropriate by the State agency.

(D) Where appropriate, for a child age 16 or over, a written description of the programs and services which will help such child prepare for the transition from foster care to independent living.

(E) In the case of a child with respect to whom the permanency plan is adoption or placement in another permanent home, documentation of the steps the agency is taking to find an adoptive family or other permanent living arrangement for the child, to place the child with an adoptive family, a fit and willing relative, a legal guardian, or in another planned permanent living arrangement, and to finalize the adoption or legal guardianship. At a minimum, such documentation shall include child specific recruitment efforts such as the use of State, regional, and national adoption exchanges including electronic exchange systems.

A detailed inquiry is not required.[8] Spending clause legislation must contain specific "rights creating" language before a court can find an implied cause of action or right enforceable under 42 U.S.C. § 1983. *See Gonzaga Univ. v. Doe,* 536 U.S. 273, 282-83, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002). The Supreme Court has recently been highly suspicious of contentions that various federal administra-

---

[8] Under federal law, whether a statute creates a private cause of action is mostly dependent on three factors: (1) whether the plaintiff is an intended beneficiary of the statute, (2) whether the plaintiff's asserted interests are not so vague and amorphous as to give ascertainable standards to the judiciary, and (3) whether the statute imposes a binding obligation on the state. *Blessing v. Freestone,* 520 U.S. 329, 340-41, 117 S. Ct. 1353, 137 L. Ed. 2d 569 (1997). Since we decide this matter consonant with the threshold factor established in *Gonzaga University v. Doe,* 536 U.S. 273, 282-83, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002), we do not specifically address these factors.

tive or funding schemes create enforceable claims of right. *See, e.g., id.; Alexander v. Sandoval*, 532 U.S. 275, 288, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001) (§ 602 of Title VI of the Civil Rights Act of 1964 does not create enforceable right to be free of unintentional discrimination). We do not find such rights creating language here.

We therefore hold that 42 U.S.C §§ 671(a)(16) and 675(1) do not create an enforceable right to injunctive relief.

## V. OTHER ISSUES

DSHS argues that the original class was improperly certified, that the trial court improperly denied its posttrial motion to revise the class, and that the injunction entered was too broad. Given our disposition, we vacate the injunction in its entirety, and decline to reach issues regarding class certification. The parties are free on remand to make additional motions to modify the class consistent with this opinion. We do not reach whether the trial court abused its discretion in declining to add DSHS Secretary Dennis Braddock as a party. On remand, the class may move to add Secretary Braddock as a party, and we leave it to the able hands of the trial judge to determine if it is appropriate. We do not reach whether judicial estoppel is appropriate.

## CONCLUSION

We therefore hold that foster children have substantive due process rights to be free of unreasonable risk of harm, and a right to reasonable safety. Alleged violations of that right will be measured on the professional judgment standard as articulated in *Youngberg*, 457 U.S. 307, and its progeny. We find that the jury instructions did not correctly articulate the right and the standard, and that the error was not harmless. We further hold that the trial court erred by admitting the ombudsman's report and evidence of national aspirational standards. We affirm in part and reverse in part the admittance of standards in other states. The trial court did not err in its judgment on the use of

fiscal constraints or by admitting evidence of past DSHS conduct. We hold that RCW 74.14A.050(2) and (3), RCW 74.13.250 and .280 do not create a private cause of action. We affirm the trial court that 42 U.S.C. §§ 671(a)(16) and 675(1) are not privately enforceable. We do not reach questions surrounding class certification, the scope of the injunction, or substitution of parties. Attorney fees are denied.

We therefore vacate the injunction and the verdict, and remand for further proceedings consistent with this opinion.

ALEXANDER, C.J.; JOHNSON, MADSEN, SANDERS, IRELAND, BRIDGE, and OWENS, JJ.; and THOMPSON, J. Pro Tem., concur.