COURT OF FILED
STATE OF APPEALS DIV I
2017 SEP 11 AM 10: 19


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of:<br><br>GRIFFIN LEE<br>DOB: 11/28/2000<br><br>PERRY LEE and CRISTA JOHNSON,<br><br>Appellants,<br><br>v.<br><br>DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES,<br><br>Respondent. | DIVISION ONE<br><br>No. 74065-2-I<br>(consol. with No. 74968-4-I and<br>No. 74969-2-I)<br><br>PUBLISHED OPINION<br><br>FILED: September 11, 2017 |

DWYER, J. — This case contains aspects of both tragedy and travesty. At the center of it all is a profoundly disabled young boy, now aged to early adolescence. Cared for by his parents in the family home for over a dozen years, without government financial assistance, he eventually appears at a hospital near death from starvation. The chaotic aftermath of his appearance culminates in a dependency trial in which the law is misapplied and unsupportable findings and determinations are made. The enmity on all sides is palpable. Whether this enmity can or will lessen is beyond our control. But ensuring that the law be applied equally and fairly is not. Accordingly, we reverse the judgment and challenged orders of the trial court and remand this action for new proceedings consistent with this opinion.

I

Griffin[1] was born to Crista Johnson and Perry Lee on November 28, 2000. Griffin has a fraternal twin, one older brother, and one younger brother. Griffin's brothers are healthy.

Ms. Johnson and Mr. Lee live together with their children in Seattle. Ms. Johnson is a program manager who works between 40 and 70 hours each week. Mr. Lee was employed as a product manager but left his career to be a stay at home father from 2000 through 2013. Mr. Lee has been an officer of the parent teacher association, volunteered with the special education program, and has been involved with the Seattle Central Little League, Capitol Hill Soccer Club, and the Mitochondrial Guild—a group formed to raise money for mitochondrial research. Mr. Lee is currently employed as a fiscal specialist at Washington Middle School.

## Medical History

Griffin was born with numerous medical conditions, including epilepsy, mitochondrial disorder, cortical visual impairment, developmental delays, chronic vomiting, and kidney stones. Griffin is functionally blind, nonverbal, nonambulatory, and exhibits self-injurious behavior. Griffin also has low bone mineralization and minimal density, causing his bones to break easily.

Dr. Russell Saneto, Griffin's neurologist, placed Griffin on a ketogenic diet when he was an infant. The ketogenic diet was intended to help manage Griffin's

---

[1] Recognizing that Griffin has had many challenges in his young life, we choose to honor his fortitude, autonomy, and individuality by referring to him by the use of his full name, rather than depersonalizing him by the use of his initials.

seizures. Ketogenic diets are high in fats but low in carbohydrates and proteins. Griffin's diet required close monitoring and frequent supplementation with vitamins and minerals to prevent deficiencies. Griffin was seizure-free from 2004 until late 2013 while on the ketogenic diet.

Caring for Griffin proved both challenging and time consuming. Each day, Griffin's parents would bathe and dress him, brush his teeth, bottle feed him, prepare his meals for the day, and change his diapers. Griffin attended school most days and often participated in physical therapy, occupational therapy, and vision therapy. Because Griffin's medical conditions are so complex, his parents sought help from medical clinics around the country. Griffin's parents drove him to appointments at clinics around Seattle, Detroit, St. Louis, and Vancouver, Canada. Ms. Johnson testified that she was not able to find other parents with a similar family and a child that required as much care as Griffin.

Griffin enjoys playing with his brothers while at home. Griffin recognizes his brothers and responds to them differently than he does to strangers. Griffin and his brothers vacationed together using the family car, which his parents outfitted to accommodate a refrigerator used to store Griffin's formula. Despite their best efforts, Griffin's parents often worried that their nondisabled children were not getting enough attention. Griffin's brothers helped raise him but—as children themselves—they were never "in charge" of Griffin.

Griffin has been hospitalized numerous times throughout his life, often because of chronic vomiting and dehydration. Griffin was hospitalized at least seven times between 2007 and 2013. When hospitalized, Griffin was typically

given intravenous fluid therapy as well as nutrition through a nasal feeding tube. Although Griffin's parents always consented to the temporary use of the nasal feeding tube, the subject was very contentious. Griffin's parents refused to take Griffin home with a nasal feeding tube inserted because they were concerned that Griffin would tear out the tube.

Griffin was chronically malnourished between the ages of 6 and 13. Between 2007 and 2014, Griffin's weight fluctuated between 11.4 kgs and 15 kgs. Hospitalization resulted in slight weight gain, although Griffin's weight would drop after being discharged. Because of Griffin's chronic malnourishment, the subject of a permanent feeding tube (g-tube) was discussed with his parents on multiple occasions. The issue of g-tube use is among the most contentious subjects in this wrenching dispute.

Griffin's parents consistently opposed the surgical insertion of a g-tube as a solution for Griffin's malnourishment. His parents believed that Griffin enjoyed the process of bottle feeding and they were concerned that Griffin's self-injurious behavior would result in him pulling out any permanent tubes that were inserted. Griffin's parents were not always able to effectively convey their concerns to the medical providers and, as a result, the medical providers were not able to satisfactorily alleviate the parents' concerns.[2]

Medical professionals at Seattle Children's Hospital (SCH), where Griffin received most of his treatment, discussed the g-tube with Griffin's parents on

_____

[2] For example, it is not clear whether Griffin's parents understood that children who use a g-tube can continue to orally feed.

- 4 -

numerous occasions. Dr. Saneto also discussed the g-tube with Griffin's parents on at least two occasions and offered recommendations concerning methods of preventing Griffin from removing the g-tube. Dr. Saneto believed that the g-tube would alleviate Griffin's vomiting. Griffin's gastrointestinal clinic doctor recommended a g-tube in 2007. Griffin's ketogenic dietician, Aaron Owens, also recommended a g-tube in 2007. Griffin's parents refused.

In 2008, Dr. Saneto referred Griffin to the Medically Complex Child (MCC) Service at SCH. Christa Kleiner, an MCC pediatric nurse practitioner, worked with Griffin during that time. Kleiner informed Griffin's parents that the MCC team "believed that [Griffin] needed to be fed through a tube rather than through the bottle and that would help him to become better nourished and less vomiting and it would be part of the workup to understand what was going on." Griffin's parents refused placement of a permanent tube but allowed the MCC team to use a temporary tube. The MCC team believed that a feeding tube could solve Griffin's frequent vomiting, as the vomiting may have been caused by Griffin's tendency to drink bottles very quickly.[3] Kleiner later testified that the MCC team would not recommend a feeding tube if they felt that the tube would be pulled out frequently.

The use of the temporary feeding tube helped to alleviate Griffin's vomiting. However, Griffin did not gain any weight despite receiving approximately 2,100 calories per day. By the end of the 2008 hospitalization, the

---

[3] Because the exact cause of the vomiting was unknown, the MCC team wanted to complete a three month trial period of tube feeding. Kleiner testified at trial that "if a slower feed allows the food to be retained, that in itself is diagnostic of the vomiting."

MCC team determined that Griffin's failure to thrive "may be due to his underlying condition and not necessarily inadequate intake/excessive vomiting." The MCC team believed that Griffin "would not benefit from a g-tube placement and there would be no medical indication for forcing the parents to place a g-tube at this time."

Ethics Consultations

Griffin was hospitalized for vomiting and dehydration on November 30, 2011. Griffin's school had contacted child protective services (CPS) to report possible neglect. Accordingly, the child abuse and neglect team at SCH became involved. Griffin's parents refused to consent to the insertion of a g-tube during this hospitalization.[4]

During the November 2011 hospitalization, SCH referred Griffin's case for a bioethics consultation. The ethics consultation was performed by Dr. Benjamin Wilfond, the director of the Treuman Katz Center for Pediatric Bioethics at SCH. Dr. Wilfond consulted with members of the MCC team and other care providers at SCH to complete the consultation. The purpose of the ethics consultation was to determine whether SCH's continued treatment of Griffin without the use of a g-tube constituted neglect "in an 11 yo 11 Kg boy with profound developmental delay and seizures, who has . . . recently had fracture related to osteopenia."

Dr. Wilfond noted that Griffin's parents "have been committed to caring for Griffin and involving him in family life," but were strongly opposed to the use of a

---

[4] In lieu of the g-tube, SCH required Griffin's parents to bring him in to the hospital weekly so that SCH could track Griffin's weight.

permanent feeding tube. Griffin's parents believed that weight gain would not offer Griffin a significant benefit to his quality of life to justify the medical intervention. Dr. Wilfond agreed that it was "not clear how much medically provided nutrition will improve [Griffin's] quality of life."

Dr. Wilfond believed that addressing Griffin's profound malnutrition was in his best interest but also credited Griffin's parents' wishes to avoid a permanent feeding tube "BECAUSE OF HIS PROPENSITY TO SWIFTLY REMOVE ANY FOREIGN BODY." Dr. Wilfond determined that "it is not clear that requiring [g-tube] feed over the parents' objections is the best course of action for this child within his family context, but more information is needed."

SCH referred Griffin's case to Dr. Wilfond for a second ethics consultation in February 2013. Griffin's medical providers were concerned "about parents' apparent unwillingness to provide nutritional support to a 12 year old child with probable mitochondrial cytopathy who has persistent vomiting, necessitating limited foods and volume." Dr. Wilfond consulted with the MCC team and various other medical professionals at SCH to complete the consultation.

Dr. Wilfond was concerned that Griffin's feeding regimen was not effective. Dr. Wilfond recommended inviting school providers to meet with the dietician and family and providing outpatient nutritional support to the family and school. Dr. Wilfond recommended being "explicit with the family that the

rationale for deference to their approach is because palliative care is appropriate in this context, and this is the family's version of palliation."[5]

Significantly, although Dr. Wilfond disagreed with Griffin's parents' decision to refuse a permanent feeding tube, he nevertheless believed that the information at hand was not sufficient to categorize the refusal as "clearly the wrong thing to do." The medical team agreed:

> While the parents are very challenging to engage with, based on the past history, there was a consensus that Griffin's clinical status will not be much different in a different environment. Further, even though the family is difficult to engage with, they continue to appear invested, including bringing Griffin in for care during this episode. It is plausible that the family's home relationship is critical to Griffin's survival to this age.

### Griffin's Heath Declines

On December 16, 2013, Griffin had a seizure. His mother contacted Dr. Saneto, who asked that she bring Griffin into the clinic for a weight check and to test Griffin's Lamictal level. However, that day was a work day for Ms. Johnson. She stated that she could not take Griffin in to be weighed that day and instead inquired about bringing him in over the weekend. But the clinic was not open on weekends. Griffin was not weighed.

On January 31, 2014, Griffin's mother e-mailed Dr. Saneto and informed him that Griffin had two seizures at school the previous day. Dr. Saneto asked Ms. Johnson to bring Griffin in for a weight check. On February 5, 2014, Griffin's dietician followed up, asking when Griffin would be coming in for a weight check.

---

[5] Palliative care focuses on providing relief from symptoms, pain, and stress for the patient and their family.

Griffin's parents stated that they could only bring Griffin in to the clinic on weekends. The clinic was closed on weekends.

On February 18, 2014, Dr. Saneto again contacted Griffin's parents to ask about bringing Griffin in to the clinic for a weight check. A week later, on February 25, 2014, Ms. Johnson brought Griffin to the clinic for his regularly scheduled neurology visit. Unfortunately, Dr. Saneto was running 90 minutes behind schedule that day. Ms. Johnson had to return to work before Griffin could be weighed.

Griffin was weighed by Dr. Saneto on April 2, 2014. He weighed 12.5 kgs in his clothes. Dr. Saneto questioned whether Ms. Johnson was refusing to remove Griffin's clothing to avoid the medical staff observing how emaciated Griffin had become. Ms. Johnson admitted that Griffin had not been receiving all of his solid foods during the school day and that she did not always give Griffin the leftover food at home. Griffin's mother did not seem concerned about his weight. Despite Griffin's declining health and precariously low weight, Dr. Saneto did not seek to have Griffin admitted to the hospital. Instead, indicating a lack of apparent urgency, a follow-up appointment was scheduled for six months in the future.

Griffin was weighed again on May 16, 2014, when his mother took him in to SCH for an electroencephalogram (EEG). His weight had dropped to

11.3 kgs. Ms. Johnson later testified that she had expected Griffin to be admitted to SCH because of his low weight—but he was not.[6]

### June Hospitalization

Griffin was hospitalized three weeks later on June 9, 2014, following a series of seizures. Griffin weighed 10.3 kgs upon admission. Several members of the medical team were shocked by Griffin's emaciated state. Because of Griffin's severe condition, a nasal tube was placed in Griffin without obtaining parental consent. A nurse later contacted his parents to obtain consent for a skeletal survey but his parents refused.[7]

Upon encountering Griffin, Kleiner, who had been treating him since 2008, "promptly walked out of the room into the bathroom, vomited, and called for immediate attention" to determine an appropriate care plan. Kleiner believed that Griffin's condition was the worst that she had seen in her career and she no longer trusted that he was safe in the care of his parents. Griffin's dietician, Owens, began crying upon seeing him—she had never seen a child so malnourished. Owens did not want Griffin to return home with his parents because she was fearful that his condition would worsen.[8]

Dr. Saneto saw Griffin shortly after he was admitted. Dr. Saneto had never seen Griffin so thin. Although Dr. Saneto had seen Griffin two months

---

[6] The record does not indicate who was responsible for weighing Griffin and administering the EEG on this date.

[7] Ms. Johnson later testified that she asked the nurse to have a doctor contact her and explain why a skeletal survey was being requested. No one asked Ms. Johnson about the skeletal survey after that telephone call.

[8] Ms. Johnson testified that Griffin "looked the same" as he always did when she would take him to the hospital.

earlier and had not admitted Griffin to the hospital, he was now worried that Griffin might die. Dr. Saneto believed that Griffin should be removed from his parents' care. Dr. Saneto believed that Griffin's parents were doing the best that they could but that the circumstances were overwhelming them. He was worried that Griffin's condition would not improve if he returned home.

Dr. Kenneth Feldman examined Griffin on June 12, 2014. Dr. Feldman is a general pediatrician with a specialty in child abuse. The MCC team indicated to Dr. Feldman that Griffin's parents had not been mixing his formula correctly and had not been picking up the prescribed amount of formula.[9] Dr. Feldman determined that Griffin was starved and at a very high risk of dying of starvation, that he was receiving inadequate calories, and that his starvation had worsened over the preceding six months. Dr. Feldman believed that Griffin's parents had been providing inadequate care to Griffin and had adamantly refused the medical team's solutions for Griffin's persistent vomiting on multiple occasions.[10]

Dr. Doug Opel, vice-chair of the ethics committee at SCH, conducted a third ethics consultation in June 2014. The goal of the third ethics consultation was to determine "whether the parents' ongoing decision-making regarding managing Griffin's nutritional status constitutes medical neglect." Dr. Opel determined that "[w]hile this is ultimately for CPS to decide, we agree with the

---

[9] Police obtained a search warrant to search for extra formula in Griffin's parents' house based on SCH's belief that his parents were not feeding Griffin all of the formula that they were prescribed. The search was fruitless. Indeed, there is no evidence that Griffin's parents were not picking up all of the prescribed formula or not feeding Griffin all of the formula that they had picked up. This allegation against Griffin's parents appears to be completely unfounded.

[10] Dr. Feldman also noted that Griffin's parents seemed entirely unconcerned about Griffin's weight—they had brought Griffin in to the emergency room because of his seizures, not because of his near-death starvation.

MCC team's decision to notify CPS given the potential that Griffin's severe malnutrition and weight loss evident on this admission may be due to the family not meeting Griffin's nutritional requirements."

Griffin was placed into protective custody on June 12, 2014. Two days later, Rachel DeWind from CPS filed a dependency petition. The petition alleged that Griffin was dependent both because there was no parent, guardian, or custodian capable of caring for him and because he had been abused or neglected while in his parents' care. DeWind later testified that, upon Griffin's hospitalization, she did not understand Griffin's needs and therefore did not offer his parents any services that would enable Griffin to return home. DeWind also filed a dependency petition for each of Griffin's brothers but those petitions were later dismissed.

Griffin gained weight while he was hospitalized. A nasal tube was used to feed Griffin throughout his hospitalization and the use of the nasal tube mostly resolved the vomiting. Griffin's parents consented to a surgical procedure to insert a permanent feeding tube in August 2014. The procedure failed.

### Posthospitalization

Griffin was hospitalized in SCH until October 16, 2014, after which, as the result of a court order, he was transferred to Ashley House in Enumclaw. The court also granted the Department of Social and Health Services' petition to authorize a surgery to remove Griffin's kidney stones and for a surgery to insert a feeding tube. The surgery to remove Griffin's kidney stones failed. Also unfortunately, Griffin was returned to SCH shortly after he was placed in Ashley

House. Staff members at Ashley House had handled him too roughly and Griffin's femur and humerus were broken while under Ashley House's care.

Griffin received a g-tube in March 2015, pursuant to a court order. Griffin gained weight following the insertion of the g-tube. By the summer of 2015, Griffin weighed 26 to 28 kgs. Griffin was placed in Children's Country Home following his hospitalization and he remained there throughout the trial.

In January 2016, Griffin's tibia was broken while under Children's Country Home's care. Ms. Johnson testified to her experience visiting Griffin at Children's Country Home:

> Griffin did not go to school for a very long time, I don't see him ever interacting with his peers, I don't see staff interacting with him other than to feed or bathe or change him, meaning diapering. I do not see volunteers like he's been exposed to, working with him. He does not have his family there. He is by himself when we get there. He is in a room, other children are in the room. They are not interacting and they're not interacting with the staff.

Children's Country Home later notified the Department that it could no longer care for Griffin. The Department sought to place Griffin in a care facility across the state, near Walla Walla. Griffin was eventually returned to Ashley House.

Prior to trial, Griffin's parents agreed that there was no parent, guardian, or custodian who was capable of adequately caring for him. However, Griffin's parents disputed the allegation that they had abused or neglected Griffin. Following the fact-finding hearing, the trial court found that Griffin's parents had abused or neglected him.

Two months after the entry of the trial court's findings of fact, the court held the disposition hearing.[11] Griffin's parent's filed a motion requesting that the trial court appoint independent counsel on behalf of Griffin. The trial court denied the parents' motion to appoint independent counsel for Griffin and placed Griffin in the care of the Department. Each parent now appeals.

## II

Griffin's parents first contend that the trial court erred by excluding the testimony of Dr. Marsha Hedrick at the fact-finding portion of the trial. The basis for the trial court's ruling was that Dr. Hedrick was disclosed late as a witness. Because the trial court failed to apply controlling legal authority in reaching the challenged decision, the parents' assignment of error is meritorious.

Prior to excluding the testimony of a late-disclosed witness, "the trial court must explicitly consider whether a lesser sanction would probably suffice, whether the violation at issue was willful or deliberate, and whether the violation substantially prejudiced the opponent's ability to prepare for trial." Jones v. City of Seattle, 179 Wn.2d 322, 338, 314 P.3d 380 (2013) (citing Burnet v. Spokane Ambulance, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997)). An appellate court may not "consider the facts in the first instance as a substitute for the trial court findings" required by Burnet. Blair v. TA-Seattle E. No. 176, 171 Wn.2d 342,

---

[11] Pursuant to RCW 13.34.110(4), "[i]mmediately after the entry of the findings of fact, the court shall hold a disposition hearing, unless there is good cause for continuing the matter for up to fourteen days. If good cause is shown, the case may be continued for longer than fourteen days." Here, the trial court found that there was good cause to hold the disposition hearing more than 14 days following the fact-finding hearing.

351, 254 P.3d 797 (2011).  A trial court's erroneous exclusion of a witness is subject to a harmless error analysis.  Jones, 179 Wn.2d at 356.

A

On the ninth day of trial, Ms. Johnson and Mr. Lee disclosed their intent to call Dr. Hedrick to testify.  Dr. Hedrick is a psychologist who the parents retained independently, at their own expense, to conduct a psychological evaluation and to "rule out any psychopathy that would prevent [the parents] from being able to assess what was in Griffin's best interest."  The parents did not identify Dr. Hedrick as a witness until 54 days after the updated witness lists were due.

Counsel for Ms. Johnson and Mr. Lee argued that the late disclosure was not willful.  Counsel stated that the Department and the court-appointed special advocate (CASA) proposed a list of questions for Dr. Hedrick to answer and that Dr. Hedrick's evaluation was not completed until after trial began.  Counsel stated that the decision to endorse Dr. Hedrick was made after reviewing her completed evaluation and after discussing her fees and related costs with the parents.

The Department objected to Dr. Hedrick's testimony at the fact-finding portion of the trial, which was underway by the time the parents identified Dr. Hedrick as an expert witness.  Although it had previously posed questions to Dr. Hedrick, the Department had not yet interviewed or deposed her.  The Department further argued that testimony as to whether the parents have a mental health propensity to abuse or neglect their child was inappropriate and would go to the ultimate issue before the court.  The Department contended that

permitting such testimony so late into the trial would be highly prejudicial to the Department's case.

The trial court ruled:

> Let's compromise. I will allow her in the disposition case, but she's not listed. This late in the game, there's no way that I can expand the calendar as it is in a crowded witness list to add another witness for the defense. So if you do want to put her up, then we'll have her here. I'll hear her on the dispositional side.

Counsel for Ms. Johnson and Mr. Lee then made an offer of proof for the record.

> I do believe that Dr. [Marsha] Hedrick if called to testify would testify that she conducted a thorough clinical evaluation of both Perry Lee and Christa Johnson, administered appropriate psychological testing, and found no psychological problems that would prevent them from assessing Griffin's best interest, that she talked to many collaterals, including professionals at Children's Hospital including Dr. Saneto and Aaron Owens, has answered many questions that the Department has with regard to what about the parents that would prevent them from adequately caring for Griffin, and I believe her findings are consistent that these parents acted in what they believed were Griffin's best interests.

The trial court excluded Dr. Hedrick's testimony from the fact-finding portion of the trial solely because the trial court believed that the then-existing list of witnesses filled its trial calendar. But such reasoning is directly contrary to controlling case law, which requires application of the Burnet factors rather than simple enforcement of pretrial calendaring orders. See, e.g., Keck v. Collins, 184 Wn.2d 358, 357 P.3d 1080 (2015); Jones, 179 Wn.2d 322; Teter v. Deck, 174 Wn.2d 207, 274 P.3d 336 (2012); Blair, 171 Wn.2d 342; Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 132 P.3d 115 (2006); Burnet, 131 Wn.2d 484. The trial court, however, did not err only by resting its decision on a forbidden basis.

Here, the trial court conducted *no* inquiry into the <u>Burnet</u> factors and made *none* of the findings required by Supreme Court case law.

That the trial court erred is beyond dispute.

B

The Department contends that any error was harmless because the trial court eventually heard testimony from Dr. Hedrick during the disposition phase of the trial and because Dr. Hedrick's testimony would not have changed the trial court's findings.

It is true that the trial court permitted Dr. Hedrick to testify during the disposition portion of the trial. Dr. Hedrick testified as to her psychological evaluation of Griffin's parents. Dr. Hedrick testified that Griffin's parents were not deficient in their parenting and that they did not need any mental health services. Dr. Hedrick further testified that Griffin's parents tried to make reasoned decisions about the g-tube but that the situation was ambiguous as to whether a g-tube would be helpful. Dr. Hedrick testified that she did not have any reason for concern about Griffin's parents' ability to care for him.

The trial court heard Dr. Hedrick's testimony and read Dr. Hedrick's interviews with Griffin's parents. The trial court then stated that

> the premise of [Dr. Hedrick's] report and conclusions are inconsistent with this Court's finding of negligence. Therefore, a new psychological evaluation with a mutually agreed upon provider is needed to determine what the parents need to do differently so that what happened to Griffin will never happen again. The parents' deficiencies are real and need to be attended to before reunification can occur.

The trial court's determination reveals that the exclusion of Dr. Hedrick from the fact-finding portion of the trial was not harmless. Indeed, the trial court explicitly refused to credit Dr. Hedrick's testimony because it was contrary to the trial court's own findings of fact, entered after the initial phase of trial.

Dr. Hedrick was called to testify in order to rebut the Department's contention that Griffin's parents abused or neglected their son. Dr. Hedrick was the only psychologist to offer expert testimony as to Griffin's parents' mental health and their ability to make reasoned decisions regarding the permanent feeding tube and Griffin's quality of life. It was essential that this testimony be heard and considered during the fact-finding portion of the trial, when such matters were at issue.

Entertaining Dr. Hedrick's testimony in the second phase of the trial, at a time when the trial court was unwilling to credit it and when many key factual issues were treated as resolved and foreclosed, did not cure the trial court's error. The error was not harmless.

The trial court's finding of abuse or neglect goes to the very heart of this matter. Accordingly, we remand this matter for new fact-finding and disposition hearings.[12]

### III

Ms. Johnson and Mr. Lee also contend that substantial evidence does not support the trial court's finding that they abused or neglected Griffin. Although

---

[12] We decline to remand this case to a different judge, as the parents have requested. But we direct the judge to determine, on the record, whether he can approach this case anew, with an open mind, and with fairness. We will not presume to examine his heart and mind so as to make that decision for him.

we remand this matter based on the Burnet error, the legal principles to be applied and the scope of the evidence to be considered on remand necessitates further discussion.

We review a trial court's determination of dependency for substantial evidence. In re Welfare of Key, 119 Wn.2d 600, 613, 836 P.2d 200 (1992). Evidence is substantial where, viewed in the light most favorable to the prevailing party, a rational finder of fact could find the fact in question by a preponderance of the evidence. In re Dependency of M.P., 76 Wn. App. 87, 90-91, 882 P.2d 1180 (1994). Because the trial court is in the best position to hear testimony and observe witnesses, we do not decide the credibility of witnesses or weigh the evidence. M.P., 76 Wn. App. at 91.

Before a court may declare a child dependent, it must find by a preponderance of the evidence that the child meets one of the statutory definitions of a "dependent child" set forth in RCW 13.34.030. Key, 119 Wn.2d at 612. A "dependent child" is a child who (a) has been abandoned, (b) is abused or neglected, or (c) has no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development. RCW 13.34.030(6).

"Abuse or neglect" is defined as "injury of a child by any person under circumstances which cause harm to the child's health, welfare, or safety, . . . or the negligent treatment or maltreatment of a child by a person responsible for or providing care to the child." RCW 26.44.020(1). "Negligent treatment or

maltreatment" is "an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety." RCW 26.44.020(16).

The trial court herein made several findings of fact and conclusions of law that are challenged on appeal. Relevant here are the trial court's findings and conclusions that:

1. A child's failure to thrive constitutes a basis for a finding of negligent treatment by a parent.

2. Griffin was in "clear and present danger" when he was hospitalized in June 2014.

3. The parents' assertion that Griffin's malnourishment was due to his underlying medical conditions is not supportable in light of the fact that they rejected a permanent feeding tube.

4. The parents' rejection of the feeding tube shows a pattern of negligent conduct that led to Griffin's near death in June 2014.

5. Despite warnings from SCH, the parents did not monitor Griffin's weight and health.

6. The parents' hostile relationship with SCH supports a finding of neglect.

Ms. Johnson, Mr. Lee, and Amicus Curiae Northwest Justice Project (NJP) identify numerous concerns with the trial court's findings and conclusions. Additionally, the trial court's reliance on Griffin's parents' rejection of the feeding

tube raises questions regarding the scope of the evidence that should be considered on remand. Each of these issues is addressed in turn.

A

The trial court herein concluded:

A child's failure to thrive constitutes a basis for negligent treatment by a parent. In, In re Dependency of E.L.F., 117 Wn. App. 241[, 70 P.3d 163] (2003), the child was found dependent after months of low weight under the mother's care. The child had gained weight three months immediately following removal from his home. The court held that finding of parental neglect does not require ruling out all other possible organic causes for the condition and can be based on logical inference that the root cause was inadequate care in the home. Id., at 247.

. . . .

. . . The Parents argue that Griffin's malnourished state was due to his frequent emesis and Griffin's conditions causes of which are not precisely known. . . .

. . . The Parents' argument is not supportable especially in light of their rejection of a feeding tube. First, although Griffin has multiple medical problems, including most probably mitochondrial disease, the medical evidence show that as far as his weight is concerned, Griffin can and did maintain weight with proper nutritional feedings and that he can gain weight and thrive. When he was fed at the hospital and also at his current home, Griffin was not near death, and Griffin's underlying medical conditions were not obstacles to gaining and maintaining proper weight.

The trial court relied on both a "logical inference" analysis and a hindsight analysis when concluding that Griffin's parents abused or neglected Griffin by refusing to consent to a permanent feeding tube. The trial court's logical inference analysis cited to our decision in In re Dependency of E.L.F., 117 Wn. App. 241, 70 P.3d 163 (2003).

E.L.F. concerned an underweight child who was brought into the hospital for a check-up. Worried about the child's malnutrition, medical providers told the mother to bring the child back into the hospital the following day. When she did

not, CPS filed a dependency petition. After the child was removed from his mother's care he began to gain weight. The trial court found that the child failed to thrive while in his mother's care and that there was no likely explanation for the child's developmental delays other than a deficiency in his home environment. We later determined that the trial court's finding was supported by substantial evidence and affirmed. E.L.F., 117 Wn. App. at 245-47.

NJP asserts that E.L.F. is no longer good law and that the trial court's analysis herein was erroneous in light of a recent Division Three opinion, Brown v. Department of Social and Health Services, 190 Wn. App. 572, 360 P.3d 875 (2015).

The mother in that case appealed a finding by the Department that she had engaged in neglect by reason of negligent treatment or maltreatment of her son. Brown, 190 Wn. App. at 579. The primary issue before the appellate court was whether the Department erroneously incorporated a "reasonable person" standard into the legal standard required to uphold a finding of neglect or abuse against a parent. The appellate court answered in the affirmative. Brown, 190 Wn. App. at 587. The Department also argued that the mother was negligent for attempting an at-home medical treatment for her son, asserting that the mother should have taken extra precautions because she lacked qualifications in health care. The appellate court rejected that argument, noting that the Department "employ[ed] hindsight that is unbecoming even for a negligence standard. Under negligence law, courts will not view a party's acts with the clarity of hindsight." Brown, 190 Wn. App. at 596.

Contrary to NJP's assertions, nothing in Brown serves to abrogate our analysis in E.L.F. Rather, Brown simply confirmed that a determination of abuse or neglect cannot be based on a finding of common law negligence. This is consistent with the legislature's desire to avoid sanctioning parents for simple negligence—a standard that would "place every Washington parent in jeopardy." Brown, 190 Wn. App. at 593.

NJP fails to identify anything in the record establishing that the trial court herein applied a "reasonable person" standard when concluding that Ms. Johnson and Mr. Lee abused or neglected Griffin. Rather, the trial court explicitly held that Griffin was in "clear and present danger" when he was admitted to the hospital in June 2014—language that is consistent with the statutory definition of "[n]egligent treatment or maltreatment."[13] RCW 26.44.020(16).

However, the trial court's reliance on hindsight and citation to E.L.F. was inappropriate. Unlike the child at issue in E.L.F., Griffin *does* have numerous medical conditions that demonstrably affect his weight. Griffin's medical providers were unable to identify the exact cause of his vomiting and malnutrition and could not say with certainty, at any time prior to the institution of the dependency, that the use of a permanent feeding tube would ameliorate either of these issues. Although it is now clear that the use of a permanent feeding tube reduced Griffin's vomiting and allowed him to gain weight, this was not a situation in which a court could logically infer that Griffin's malnutrition was the result of an

---

[13] The definition of "[n]egligent treatment or maltreatment" is "an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety." RCW 26.44.020(16).

unsafe home environment. Moreover, the trial court's reliance on hindsight to conclude that rejection of the feeding tube constituted abuse or neglect was improper. Brown, 190 Wn. App. at 596.

B

As discussed herein, SCH held two ethics consultations prior to the June 2014 hospitalization. The parents' refusal to consent to a permanent feeding tube was central to both of these consultations. Dr. Wilfond, the director of pediatric bioethics at SCH, was the medical ethicist charged with evaluating the ethics of the care being given to Griffin. In so doing, he considered the wishes of the SCH staff (that a feeding tube be surgically implanted) and the wishes of the parents (that this not be done). He also considered the reasons given for the opposing views and the treatment actually being given to Griffin. On December 1, 2011, at the conclusion of his first inquiry, Dr. Wilfond determined that, although the weight of the medical opinion was that a feeding tube should be utilized, the actual care being given to Griffin, in light of his parents' refusal to allow for the feeding tube, was consistent with applicable ethical norms. On February 21, 2013, after conducting a similar inquiry, Dr. Wilfond again reached a determination that the medical care being given to Griffin—in consideration of all of the circumstances—remained consistent with applicable ethical norms.

By the time that Griffin was hospitalized in June 2014 and SCH commenced a third ethics consultation, it was clear that Griffin was near death and that utilization of a feeding tube was appropriate as a life-saving measure.

Despite the outcome of the first two ethics consultations, the trial court found that the parents' refusal to consent to a permanent feeding tube constituted abuse or neglect. In making this finding, the trial court considered the repeated recommendations made to the parents by Dr. Saneto, school personnel, and the MCC team. The trial court did not credit SCH's own determination that a feeding tube might not improve Griffin's quality of life or health. Neither did the trial court credit or account for the two ethical determinations made by Dr. Wilfond, as part of SCH's ethics protocol, that Griffin's parents' unwillingness to consent to the use of a permanent feeding tube was not abuse and that the care received by Griffin was consistent with ethical norms, even in light of Griffin's parents' refusal to consent to the permanent feeding tube.

The evidence is clear—although not credited by or accounted for by the trial judge: during the entire time that Griffin's parents cared for him, there was never a moment when their refusal to consent to a permanent feeding tube was other than previously sanctioned by a SCH ethicist. The trial court's reliance on the actions of the parents prior to the second ethics determination is without justification. In light of the repeated ethical inquiries into the parents' actions, both of which determined that the parents' views were ethically justifiable and the care given to Griffin was consistent with ethical norms, there is no basis for concluding that the parents were acting in an abusive or negligent manner by withholding consent for the medical procedure.

A more appropriate inquiry on remand may focus on the events that occurred between the second ethics consultation and the June 2014 hospitalization that resulted in Griffin's near death. The trial court made only one finding regarding this time period:

> Despite . . . specific warnings from SCH, the Parents did not take an active role in monitoring Griffin's weight and his overall health. . . .
> . . . Consequently, when Griffin returned to the hospital yet again in June, 2014, SCH determined that Griffin's malnutrition was not due to his underlying conditions and that under the parental care, Griffin had not received proper nutrients.

The record supports that Griffin was in danger when he was finally hospitalized in June 2014. Whether the parents changed their behavior with regard to Griffin's care after the second ethics consultation, resulting in Griffin's malnourished state, may be an appropriate focus of proceedings on remand. Whether this can be proved, and whether it alone would be sufficient to support a finding of abuse or neglect, are matters upon which the present record is unclear.[14]

---

[14] The parents also assign error to the trial court's conclusion that the hostile relationship between the parents and SCH staff supports a finding of neglect.

In reaching this conclusion, the trial court stated that "it is . . . obvious to this Court that as the surrogate decision makers for Griffin, the Parents own emotional feelings towards SCH was not in the best interest of Griffin." Indeed, the record is replete with instances of Griffin's parents distrusting SCH staff, accusing SCH medical providers of negligently injuring Griffin, and refusing to work and communicate with SCH medical providers. To the extent that Ms. Johnson and Mr. Lee's actions resulted in harm to Griffin, the hostile relationship between the participants might support the trial court's conclusion.

However, the record also establishes that the antipathy was mutual—SCH's own hostile treatment of Griffin's parents was likewise not in Griffin's best interest. Whether substantial evidence supports the trial court's findings, however, is a matter that we need not reach as the trial court's findings and conclusions on remand may be at variance with its previous judgments.

It is also most unclear that such a finding, by itself, could support a finding of abuse or neglect.

IV

Ms. Johnson and Mr. Lee next contend that the trial court erred by failing to order placement of Griffin in the family home with sufficient remedial services during the period of dependency.

A

Following the fact-finding and disposition hearings, a court may order a dependent child to be removed from the child's home and placed into the care of a relative or other suitable person, the department, or a supervising agency for supervision of the child's placement. RCW 13.34.130(1)(b)(i). "If the court orders that the child be placed with a caregiver over the objections of the parent or the department, the court shall articulate, on the record, [the] reasons for ordering the placement." RCW 13.34.130(1)(b)(i).

> An order for out-of-home placement may be made only if the court finds that reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home and to make it possible for the child to return home, specifying the services, including housing assistance, that have been provided to the child and the child's parent, guardian, or legal custodian, and that preventive services have been offered or provided and have failed to prevent the need for out-of-home placement, unless the health, safety, and welfare of the child cannot be protected adequately in the home, and that:
> (a) There is no parent or guardian available to care for such child;
> (b) The parent, guardian, or legal custodian is not willing to take custody of the child; or
> (c) The court finds, by clear, cogent, and convincing evidence, a manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home and an order under RCW 26.44.063 would not protect the child from danger.

RCW 13.34.130(5).

The Department has a statutory duty to provide remedial services designed to correct parental deficiencies:

> (2) The department shall coordinate within the administrations of the department, and with contracted service providers including supervising agencies, to ensure that parents in dependency proceedings under this chapter receive priority access to remedial services recommended by the department or supervising agency in its social study or ordered by the court for the purpose of correcting any parental deficiencies identified in the dependency proceeding that are capable of being corrected in the foreseeable future. Services may also be provided to caregivers other than the parents as identified in RCW 13.34.138.
>
> (a) For purposes of this chapter, remedial services are those services defined in the federal adoption and safe families act as time-limited family reunification services. Remedial services include individual, group, and family counseling; substance abuse treatment services; mental health services; assistance to address domestic violence; services designed to provide temporary child care and therapeutic services for families; and transportation to or from any of the above services and activities.
>
> (b) The department shall provide funds for remedial services if the parent is unable to pay to the extent funding is appropriated in the operating budget or otherwise available to the department for such specific services. As a condition for receiving funded remedial services, the court may inquire into the parent's ability to pay for all or part of such services or may require that the parent make appropriate applications for funding to alternative funding sources for such services.

RCW 13.34.025.

B

During the fact-finding portion of the trial, Griffin's parents stated that they were not seeking to have Griffin returned to the family home for at least six years.[15] However, prior to the disposition hearing, the parents changed course

---

[15] Griffin's parents originally did not seek his immediate return because they were facing a criminal investigation and did not want to put their other children at risk of being removed from the family home. Ms. Johnson testified, "We've always wanted Griffin home and we've been terrified because of all the threats made to us and our other boys, about removing them. We've wanted him home every day." When asked about what threats the family had received, Ms.

and asked that the trial court return Griffin home with sufficient remedial services provided by the Department. The parents asked that Griffin be returned home at the end of the school year to avoid disrupting his schedule and to give the parents time to obtain the necessary services.

The trial court heard testimony from Denise Huynh, the social worker assigned to Griffin, regarding the Department's efforts to prevent the need for Griffin's removal from the family home or to reunify the family. Huynh testified that the Department currently recommended that Griffin be placed at Children's Country Home, where he was then residing. Huynh testified that the Department did not yet intend to investigate whether Griffin should be placed in a therapeutic foster home, a regular foster home, or be returned to the family home, as he was in the middle of receiving treatment from Children's Seattle Autism Center.

Huynh testified that the Department had not offered Griffin's parents any services for the last 14 or 15 months because they had no interest in working with her. Huynh testified that the Department did not need to explore in-home services following Griffin's hospitalization because Griffin received all the services that he needed while he was hospitalized. When asked about the parents' repeated requests to provide them with information regarding what home-based health care or respite services the Department could provide, Huynh testified that the Department "does not pay for anybody to come to your

---

Johnson replied, "That Perry and I would be arrested and charged with a crime, that the boys would be removed from our home and separated and placed into foster care."

Following the fact-finding portion of the trial, the prosecutor's office decided against filing criminal charges against Ms. Johnson and Mr. Lee.

home once your child is returned to your care . . . . [T]hat would be DDA [Developmental Disabilities Administration], if they provide it at all."

Huynh testified that, because Griffin's parents had initially agreed to out-of-home placement, the Department had not started the assessment necessary to determine whether Griffin could return home. Huynh testified that the Department would not begin this assessment until after the parents underwent a psychological evaluation.[16]

Following the disposition hearing, the trial court found by clear, cogent, and convincing evidence that manifest danger continued to exist that warranted out-of-home care. The trial court found that there was no evidence establishing that the conditions that led to the dependency had improved. The trial court also found that the Department had made reasonable efforts to prevent or eliminate the need for Griffin's removal but that those efforts were unsuccessful because the health, safety, and welfare of Griffin could not be adequately protected in the home.

The specific services offered by the Department, as identified by the trial court, included the Department's offer of psychological evaluations, medical consults for the parents to ask questions of the medical providers, and SCH's offer to allow the parents to attend rounds at the hospital while Griffin was hospitalized in June 2014.

---

[16] The Department did not accept the psychological evaluation completed by Dr. Hedrick because Dr. Hedrick did not involve the Department in the evaluation.

C

We are skeptical of the trial court's finding that the Department made reasonable efforts to prevent or eliminate the need for Griffin's removal in light of Huynh's testimony that the Department provided no services whatsoever to the parents for the 14 or 15 months preceding the disposition hearing. It may be true that the parents were hostile toward the Department but it is also clear from the record that the Department made no effort to alleviate the problems that prompted state intervention in the first place. The Department's assertion that it did not need to provide any services while Griffin was hospitalized is likewise unpersuasive and effectively negates the Department's duty to provide services under these circumstances. However, as the trial court's findings and conclusions may change on remand, we need not presently analyze the court's findings any further.[17]

V

We now address the trial court's ruling denying the parents' motion to appoint independent counsel on behalf of Griffin. Although no party assigned error to this ruling, NJP has briefed the issue and the Department has filed a brief in reply. "An appellate court has inherent authority to consider issues which the parties have not raised if doing so is necessary to a proper decision." Falk v.

---

[17] Ms. Johnson and Mr. Lee also assign error to the trial court's ordered services, including the court's order that they undergo a new psychological evaluation. Because the ordered services may change on remand, we need not reach this issue.

- 31 -

Keene Corp., 113 Wn.2d 645, 659, 782 P.2d 974 (1989). This is one such issue.[18]

A

Griffin received relatively little government assistance while in his parents' care. Except for a limited, 90-day period, for his entire life Griffin was denied funding from the DDA division of the Department. Griffin applied for funding to pay for private nursing care but was denied funding after the DDA determined that he did not qualify for specialized nursing. Griffin was also denied Medicaid because his parents were over the income limit. No one appealed these denials on behalf of Griffin. Griffin would have greatly benefited from receiving such services while in his parents' care.

Griffin did not begin receiving the specialized services he desperately needed until after he was hospitalized and removed from his parents' care. Griffin receives Medicaid and 24-hour private nursing services while in the State's care.

The record does not establish why the DDA determined that a child with such severe medical conditions was ineligible for private nursing services. NJP identifies multiple avenues that were available to the parents to secure the funding necessary to pay for private nursing services, including the Medically Needy program through Medicaid or the DDA Medicaid waiver program—both of which allow medically needy children to qualify for Medicaid services

_____

[18] Although Griffin's parents brought the motion in the trial court, Griffin is the party aggrieved by the trial court ruling. But Griffin is nonverbal and unable to act as a pro se litigant. The issue was presented to the trial court. No party other than Griffin can waive a right personal to Griffin.

notwithstanding the parents' income. WAC 388-845-0005; 182-515-1510, -1512. Importantly, the DDA's denial of funding for such services could have been appealed. NJP asserts that the Department does not generally appeal on behalf of children.

NJP has also identified a colorable legal claim that an attorney could bring to secure in-home services for Griffin. The Washington Constitution provides that the State shall care for children who are disabled. WASH. CONST. art. XIII, § 1. Federal law requires state Medicaid agencies, such as the Department, to provide disabled children with all medically necessary services in the least restrictive setting: the family home. However, in this matter, the Department has taken the position that it is only required to provide necessary services *after* the child has been removed from the family home.[19] Thus, the Department has refused to provide Griffin with the services that he requires while in the family home. Rather than correcting parental deficiencies and working toward reunification—the primary goal of dependency proceedings—the Department's position actively impedes reunification.

Independent counsel appointed to represent Griffin might have appealed the DDA's denial of funding, represented Griffin during administrative hearings with the Department, and litigated the Department's legal duty to provide the services that the parents were requesting before institutionalizing Griffin. Indeed, independent counsel could be working on behalf of Griffin at this very moment to

---

[19] Denise Huynh, the social worker assigned to Griffin, testified at the disposition hearing that "the department does not pay for anybody to come to your home once your child is returned to your care . . . . [T]hat would be DDA, if they provide it at all."

secure the necessary medical services that would allow Griffin to return to a safe environment in the family home. However, the parents' request for independent counsel was denied by the trial court after the court concluded that the parents were sufficient to perform these tasks on behalf of Griffin.

Griffin's history presents a stark case. While under his parents' care, he received no state assistance for over a dozen years. While in the custody of the State, his medical expenses and expenses of care are funded by the State. Congress has expressed a preference for children to be cared for in the family home, whenever possible. The federal constitutional supremacy clause and spending clause aspects of this situation, the tracing of federal dollars into and out of state coffers, and the decision-making that seemingly frustrates congressional desires provide legitimate fodder for a lawyer working on Griffin's behalf. We need not know the outcome of the lawyer's efforts in order to be comfortable in the belief that Griffin might, indeed, benefit from such efforts.

B

Moreover, an attorney appointed to represent Griffin pursuant to statute or his right to due process could also take an immediate step to broaden the scope of representation: applying for appointment as an accommodation under GR 33(a)(1).[20]

---

[20] Pursuant to GR 33(a)(1),
"Accommodation" means measures to make each court service, program, or activity, when viewed in its entirety, readily accessible to and usable by a person with a disability, and may include but is not limited to:
    (A) making reasonable modifications in policies, practices, and procedures;
    . . .
    (C) as to otherwise unrepresented parties to the proceedings, representation by counsel, as appropriate or necessary to making each

Although the scope of this right has not yet been fully fleshed out in appellate case law, the General Rule right plainly exists to complement or expand upon those rights already guaranteed by statute and the due process clauses of the state and federal constitutions. In this way, an attorney serving only Griffin's interests may have been of service to Griffin in these proceedings.

C

Our legislature has recognized the importance of providing children with independent counsel in a number of contexts.

In 2010, chapter 13.34 RCW was amended to require that both the State and the guardian ad litem (GAL) notify children 12 years and older of the right to request appointed counsel for a dependency proceeding. The State or the GAL must thereafter ask the child on an annual basis if he or she wants appointed counsel.[21] RCW 13.34.100(7)(c); In re Dependency of S.K-P., No. 48299-1-II, slip op. at 5 (Wash. Ct. App. Aug. 8, 2017).[22] Chapter 13.34 RCW was amended again in 2014, establishing a right to court-appointed counsel for dependent children of all ages when both parents' rights have been terminated and more than six months has passed. RCW 13.34.100(6)(a); S.K-P., slip op. at 15.

Juvenile courts are also permitted to appoint independent counsel to children in any dependency proceeding, either sua sponte or upon request of a parent, the child, the GAL, a caregiver, or the Department. RCW

_____

service, program, or activity, when viewed in its entirety, readily accessible to and usable by a person with a disability.

[21] The record does not indicate how, or if, the State complied with this requirement with regard to Griffin.

[22] http://www.courts.wa.gov/opinions/pdf/D2%2048299-1-II%20Published%20Opinion.pdf.

13.34.100(7)(a). Children are allowed to petition for reinstatement of parental rights and be appointed counsel in such a proceeding. RCW 13.34.215(2). Finally, children in extended foster care services also have a right to counsel.[23] RCW 13.34.267(6).

Washington is one of only 18 states that does not provide children a categorical right to court-appointed counsel in dependency proceedings. S.K-P., slip op. at 17 n.15. Rather, juvenile courts have discretion to appoint independent counsel for children who are the subjects of dependency proceedings. RCW 13.34.100(7)(a); JuCR 9.2(c)(1). In considering whether to appoint independent counsel for a child in the context of a termination hearing, trial courts must conduct the three-part balancing test announced by the United States Supreme Court in Mathews v. Eldridge, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). In re Dependency of M.S.R., 174 Wn.2d 1, 15, 271 P.3d 234 (2012); S.K-P., slip op. at 21. That test requires that the trial court weigh three factors: (1) the private interests at stake in a given proceeding, (2) the government's interest, and (3) the risk that the extant procedures will lead to erroneous deprivations of a private right. Mathews, 424 U.S. at 335.

The trial court herein did not analyze this issue using the Mathews factors. Instead, the court simply concluded that the parents themselves were sufficient to perform the services of independent counsel or retain independent counsel for

---

[23] "Additionally, some counties routinely appoint counsel for children in dependency proceedings." S.K-P., slip op. at 5-6. "For example, King County appoints attorneys for all children starting at age 12." S.K-P., slip op. at 6 n.6 (citing King County LJuCR 2.4(a)). We are unsure of the accuracy of the court's observation in S.K-P., given the variance between the court's observation and the factual record herein.

Griffin. In so ruling, the trial judge clearly erred. To determine whether this error was harmless, we must conduct a Mathews analysis.

1

Children have a serious liberty interest at stake in dependency proceedings that is "very different from, but at least as great as" their parents' interest. M.S.R., 174 Wn.2d at 18. A child's liberty interests at stake in a dependency proceeding include

> a child's interest in being free from unreasonable risks of harm and a right to reasonable safety; in maintaining the integrity of the family relationships, including the child's parents, siblings, and other familiar relationships; and in not being returned to (or placed into) an abusive environment over which they have little voice or control.

M.S.R., 174 Wn.2d at 20.

Children who are removed from their parents' care face a loss of physical liberty and may be forced to change homes, schools, and care facilities. Such movement may cause children significant harm. Braam v. State, 150 Wn.2d 689, 694, 81 P.3d 851 (2003). A dependency proceeding also affects a child's fundamental liberty interest in "having the affection and care of his parents." Moore v. Burdman, 84 Wn.2d 408, 411, 526 P.2d 893 (1974). "[T]he child may be at risk of not only losing a parent but also relationships with siblings, grandparents, aunts, uncles, and other extended family." S.K-P., slip op. at 24 (citing M.S.R., 174 Wn.2d at 15). Our legislature has recognized the importance of these relationships. See generally chapter 13.34 RCW.

Children have the right to freedom of personal choice in matters of family life—a fundamental liberty interest protected by the due process clause of the

Fourteenth Amendment. In re Dependency of T.R., 108 Wn. App. 149, 154, 29 P.3d 1275 (2001). A child in a dependency proceeding may be physically removed from his or her home and placed in the custody of the State, "powerless and voiceless, to be forced to move from one foster home to another." M.S.R., 174 Wn.2d at 16. "Children in dependency proceedings also have an interest in being free from harm. Despite the State's best and sincere efforts, children are not always free from harm once the State orders their placement." S.K-P., slip op. at 25.

Griffin is a medically fragile child who requires 24-hour care by individuals who intimately understand his needs. In a dependency proceeding, Griffin faces removal from his home, separation from his parents and brothers, and may be forced to move from one care facility to the next for the remainder of his life. The risk of harm that Griffin faces is not just hypothetical—the State has already removed Griffin from his home and placed him in the care of organizations that provided inadequate treatment resulting in broken bones and failed medical procedures. Griffin's relationship with his brothers has been reduced to visitation—when such visitation is possible.[24, 25] Griffin's liberty interest is extraordinarily strong.

---

[24] During this dependency, Griffin was for a time moved to a care facility across the state in Spokane—making visitation with his brothers impractical. Wash. Court of Appeals oral argument, In re Dependency of G.L., No. 74062-2-I (June 13, 2017), at 39 min. to 39 min., 30 sec. (on file with court).

[25] It is more than physical distance from his brothers that may be limiting Griffin's ability to enjoy his life. But the extent of Griffin's awareness of his situation is unclear from the record. And at oral argument, counsel for Griffin's CASA was unable to answer this question from the court: "Does Griffin miss his brothers?" Wash. Court of Appeals oral argument, supra, at 33 min. 35 sec. to 34 min. 15 sec.

2

The State's interest is also strong. Indeed, it is well accepted that the State's interest in the welfare of a child is a compelling interest. M.S.R., 174 Wn.2d at 18 (citing Lassiter v. Dep't of Soc. Servs. of Durham County, N.C., 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981)). The State also has an interest in "'an accurate and just decision'" in dependency proceedings. M.S.R., 174 Wn.2d at 18 (quoting Lassiter, 452 U.S. at 27).

3

The third Mathews factor looks to the risk of erroneous deprivation and the value of the additional procedures sought. Mathews, 424 U.S. at 335. This factor "depends on the legal and factual complexity of the situation and on the parties' ability to present their cases." M.S.R., 174 Wn.2d at 18 (citing Lassiter, 452 U.S. at 30). "By extension, whether there is a constitutionally significant risk of an erroneous deprivation of rights may also turn on whether there is someone in the case who is able to represent the child's interests or whose interests align with the child's." M.S.R., 174 Wn.2d at 18. The proper focus for consideration is the "child's individual and likely unique circumstances." M.S.R., 174 Wn.2d at 22.

The existing statutory scheme for dependency proceedings provides children with significant procedural safeguards, including the appointment of a GAL or a CASA to advocate for the child's best interests. M.S.R., 174 Wn.2d at 18. However, the appointment of a CASA is often insufficient. The CASA is not required to be an attorney, does not protect the legal rights of the child, and

"does not represent the child as an attorney represents a client." S.K-P., slip op. at 20; see also M.S.R., 174 Wn.2d at 19-21. An attorney, on the other hand, "can facilitate and expedite the resolution of disputes, minimize contentiousness, and effectuate court orders." M.S.R., 174 Wn.2d at 21.

The parents themselves may also be insufficient for protecting the interests of their children in a dependency proceeding. "Parents have their own goals within [dependency] proceedings, and although their desired placement outcomes may be aligned with the child's wishes, there are inherent conflicts of interest throughout the proceeding. The very nature of a dependency often pits a parent's interest against the child's." S.K-P., slip op. at 26 n.19. Indeed, it is often the case that "the parents' interest in a dependency proceeding will diverge from those of the child, and parents cannot be expected to sufficiently protect their children's interests." S.K-P., slip op. at 26 n.19.

Here, the unique circumstances of Griffin's medical conditions and the legal basis for dependency sought by the Department heighten the risk of erroneous deprivation. Griffin is unable to communicate with his parents or medical care providers, let alone express a desire to retain independent counsel. Yet it is apparent that independent counsel might have assisted Griffin in ways that the CASA did not. Counsel might have appealed the denial of DDA services, applied for a Medicaid waiver, and represented Griffin at administrative hearings with the Department.[26] Independent counsel might have brought suit to

---

[26] Counsel for Ms. Johnson and Mr. Lee specifically identified these services as the motivating reason for seeking appointment of independent counsel at the disposition hearing. These services were necessary in order to allow for the safe reunification of the family.

require the Department to provide Griffin with necessary in-home care. And independent counsel might have expanded the scope of representation by also seeking appointment under GR 33. The ways that an attorney can assist a person in need—as Griffin plainly is—are sometimes limited only by the imagination, intellectual dexterity, and assertiveness of the lawyer.

The trial court's determination—that Griffin's parents could perform these tasks on his behalf—is untenable, especially in the context of a proceeding in which the Department alleged (and the trial court found) that those same parents abused or neglected him. Indeed, it is evident from the trial court record and from appellate oral argument that there is no one "able to represent the child's interests or whose interests align with the child's." M.S.R., 174 Wn.2d at 18. Accordingly, we direct the trial court to appoint independent counsel for Griffin on remand.

Reversed and remanded for new fact-finding and disposition hearings.

We concur:

Cox, J.

Becker, J.

---

The Department replies that the trial court "lacks the authority to appoint an attorney to pursue Medicaid or DDA benefits for a child in a separate administrative hearing or through other litigation." But the court rule that the Department cites creates no such limitation.